# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-3204

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Bert MacArthur Johnson, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: May 18, 2012
Filed: July 31, 2012

_____

Before RILEY, Chief Judge, BYE and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

A jury convicted Bert MacArthur Johnson of possession with intent to distribute, as well as distribution of, 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Johnson appeals the district court's[1] denial of his motion for judgment of acquittal, and asks for a new trial contending (1) a biased juror rendered his trial inherently unfair; (2) the government failed to present evidence sufficient to prove he distributed 500 grams or more of methamphetamine;

---

[1] The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

and (3) the government violated his Sixth Amendment Confrontation Clause rights by failing to call as witnesses the forensic lab technician who checked the drugs found at Johnson's residence into and out of the state crime lab, and the lab supervisor who certified the lab report as a true copy of the original. We affirm.

I

Investigators began receiving information that Johnson was involved in drug distribution in the Williston, North Dakota, area as early as 2006. On February 24, 2010, officers with the Northwest Narcotics Task Force executed a search warrant on Johnson's property in Williston. Upon arriving, the officers found Johnson sitting in his pick-up truck. His ex-wife and son were also on the property.

From an ammunition box inside Johnson's pick-up truck, officers recovered approximately three pounds of methamphetamine packaged in varying quantities: seven bags contained one ounce each, two bags contained two pounds each, and one bag contained approximately ten ounces.[2] Officers also recovered smaller, purer amounts of methamphetamine in Johnson's coveralls' pocket, along with $7,500 in cash divided into four envelopes. Johnson offered the money to one agent, asking him to "just take it and walk away." Tr. at 168. Under the bed where Johnson's son was sleeping, officers recovered an additional $19,580 in cash, also packaged in

---

[2]There are 453.6 grams in a pound. A government witness testified that methamphetamine sold for $200 per gram in the Williston area at the time of Johnson's arrest. Tr. at 128. Accordingly, the methamphetamine in Johnson's truck valued approximately $271,000.

-2-

envelopes or folded into bundles.[3]  A drug dog alerted to the cash after officers placed it back under the mattress.  Officers arrested Johnson.

The drugs recovered pursuant to the search formed the basis for count one of the indictment, possession of a controlled substance with intent to distribute.  After Agent Derek Bernier secured the drugs at Johnson's residence, he took them to the state crime lab in Bismarck, North Dakota, for analysis.  According to the report submitted into evidence, the drugs were received and signed into the lab by evidence technician Brandy Schneider.  After initial testing, Schneider returned the drugs to Agent Bernier, who later brought the drugs back for further analysis.

Forensic scientist Chris Focke conducted all analyses on the drugs.  Focke testified at trial based on his own memory and by referencing a copy of the lab report he had created, which LaMonte Jacobson, the lab supervisor, had certified as a true copy of the original.  Focke told the jury what procedures he had followed and which instruments he had used to identify the substance and its purity; he had identified the substance recovered in Johnson's truck as methamphetamine.  Focke also explained the procedures the lab took to ensure the evidence remained secure, including the log system employed to document any transfer of the evidence; he testified lab procedures were properly followed in this case.  Johnson repeatedly objected to the admission of the certified lab report, and the drugs themselves, based on chain of custody, lab testing methods, and lab security.

The testimony of Jordan Magrum—regarding his drug transactions with Johnson—formed the basis for count two, actual distribution of 500 grams or more

---

[3]Officers found the cash either in envelopes or in a box, between the mattress and box spring, or under the bed, respectively.  Two envelopes contained $1,000 and one envelope contained $1,980.  In the box, there were twelve bundles of $1,000 each, and four other bundles of $2,000, $800, $600, and $200, respectively.  Tr. at 121-22.

of a controlled substance. Magrum is a recovering drug addict. He testified that he had been using and dealing controlled substances, including methamphetamine, for most of his adult life. Magrum explained he had been convicted of several drug-related crimes, including a 2010 state charge for possession of methamphetamine with intent to distribute, for which he was currently on probation. In addition, Magrum admitted he was receiving immunity from federal prosecution in exchange for testifying against Johnson.

As it related to Johnson, Magrum testified that after meeting Johnson in January 2009, they smoked methamphetamine and marijuana together on a number of occasions. Then, between February 2009 and June 2009, Magrum received, on average, one to two ounces of methamphetamine from Johnson four or five times per week to sell. Magrum estimated he received "at least at a minimum two pounds" of methamphetamine from Johnson over this time period. Tr. at 253.

Agent Charissa Remus-Kvande testified that two days after his arrest, Johnson asked to speak with members of the Task Force. During that meeting, Johnson told the officers the methamphetamine they had found in his truck was not his: someone had placed it there and Johnson had been contemplating what to do with it for the thirty minutes prior to law enforcement arriving at his property. In addition, Remus stated that while Johnson was adamant he was not a drug dealer, he did admit that people, including Magrum, had dealt methamphetamine for him in the past, that Johnson had traded methamphetamine for firearms and a vehicle, and that Johnson himself had acted as a middle man between California sellers and a local dealer, Chad Boots.

At trial, Johnson testified in his own defense. He explained that a neighbor had given him the money officers had found in his coveralls in exchange for some of Johnson's land; the parties had not yet gotten around to drawing up a transfer deed, however, prior to Johnson's incarceration. Both Johnson and his son testified the

money found under the son's bed was the son's life-long savings. As for the methamphetamine in the truck, Johnson repeated his claim that someone else had put the methamphetamine on Johnson's property, and that Johnson was sitting in the truck when law enforcement executed the search warrant wondering what he should do with that methamphetamine: he had just decided he was going to burn the drugs when law enforcement arrived. In so testifying, Johnson stated that he had found his "ammo box loaded full of marijuana and methamphetamine." Tr. at 328. Johnson admitted selling to, and receiving some methamphetamine from, Magrum, but claimed the amounts were far less than the quantities to which Magrum had testified. Finally, while Johnson admitted telling officers he was a middle man for Boots, he told the jury his prior statement was untrue: he had only told the officers this because he thought it was what they wanted to hear.

Voir Dire

The following facts are important as they relate to Johnson's claim one juror was biased and thus rendered his trial inherently unfair. During the early stages of voir dire Juror S.R. volunteered to the court she had been arrested for driving while intoxicated twelve to thirteen years ago, but that it would not affect her ability to be fair and impartial. Tr. 40-41. The court later asked if anyone had any immediate family involved in law enforcement; S.R. did not respond. Later, Johnson's attorney asked if anyone had any close friends involved in law enforcement. S.R. raised her hand. The following colloquy then took place between Johnson's attorney and S.R.:

> MR. VANNI: I just want to expand on [the Judge's question] a bit and ask if any of you have any close friends or acquaintances who work for a law enforcement agency, not just here in North Dakota, but anywhere in the country. And you are [S.R.][?]
>
> S.R.: Correct.

-5-

MR. VANNI: Yes, ma'am.

S.R.: Well, my very good friend, we lived together all through our college days in Fargo-Moorhead. She was a parole and probation officer in Fargo for four years before moving to Portland, Oregon, and she is a parole and probation officer there too.

MR. VANNI: Okay. And as you know, as has been explained, we'll have a lot of testimony in this case from law enforcement officers. Does the fact that this friend of yours is a parole and probation officer, do you think you would give more weight or find more credible the testimony of a law enforcement officer as opposed to any other individual who might testify in this case?

S.R.: Probably that they would be more credible, I guess, just based on my experience with her.

MR. VANNI: Okay.

S.R.: I hope I could be objective, but—

MR. VANNI: You would want to try to be objective—

S.R.: Yes. Exactly.

MR. VANNI: —but you're admitting that there might be a possibility that—

S.R.: There might be a possibility.

MR. VANNI: Okay. Well, I appreciate your honesty on that. Is there anyone else? . . .

Johnson never moved to remove S.R. for cause, and S.R. was seated as a juror. The jury unanimously found Johnson guilty on both counts.

II

A. The Biased Juror

The Sixth Amendment guarantees all those accused of a crime the right to be tried by an impartial jury. U.S. Const. amend. VI. This "constitutional guarantee has not been granted if any member of the jury was biased." Johnson v. Armontrout, 961 F.2d 748, 751 (8th Cir. 1992). Further, we have held that "a juror who would probably give law enforcement officers the benefit of the doubt, is not what we would consider impartial." United States v. Sithithongtham, 192 F.3d 1119, 1121 (8th Cir. 1999) (internal quotation marks and citation omitted). Today we must decide whether the impaneling of Juror S.R., who admitted there "might be a possibility" she would find law enforcement officers more credible than other witnesses, violated Johnson's Sixth Amendment right to be tried by an impartial jury, thus requiring us to remand for a new trial.

Typically, when a defendant objects to the seating of a juror, we review a trial court's refusal to excuse a juror for cause for an abuse of discretion. See United States v. Barraza, 576 F.3d 798, 801 (8th Cir. 2009). But in this case, Johnson did not ask the court to remove Juror S.R. for cause. Thus, we must first determine what standard of review applies under these circumstances. Citing Sanders v. Norris, 529 F.3d 787, 791 (8th Cir. 2008),[4] Johnson argues that failure to strike a biased juror results in a structural error that requires automatic reversal, regardless of his counsel's failure to object to seating the juror during voir dire. In contrast, the government argues that because Johnson's trial attorney failed to object to the seating of Juror S.R., we should apply plain error review. Appellee's Br. at 18 (citing United States v. Simmons, 961 F.2d 183, 184-85 (11th Cir. 1992) (per curiam) and United States

_____

[4]Sanders involved a claim of ineffective assistance of counsel pursuant to 28 U.S.C. § 2254.

-7-

v. Torres, 960 F.2d 226, 228 (1st Cir. 1992)); see also United States v. Artuso, No. 08-17263, 2012 WL 2345138, at *8 (11th Cir. June 20, 2012) (per curiam) (applying plain error review on appeal to district court's choice not to sua sponte strike an allegedly biased juror when defense counsel failed to raise a for-cause objection during voir dire).

We conclude neither side is correct. Instead, we find that by failing to object to the seating of Juror S.R. during voir dire, Johnson "intentional[ly] relinquish[ed] or abandon[ed] . . . a known right[,]" United States v. Olano, 507 U.S. 725, 733 (1993), and thereby waived his right to challenge the impaneling of an allegedly biased juror on direct appeal. In Batsell v. United States, 217 F.2d 257 (8th Cir. 1954), the defendant challenged his conviction on direct appeal, in part, by alleging he was convicted by a biased jury. We rejected this challenge stating: "The right to challenge the panel or to challenge a particular juror may be waived, and in fact is waived by failure to seasonably object." Id. at 260. We further noted "that failure to object at the time the jury is empaneled operates as a conclusive waiver if the basis of the objection is known or might have been known or discovered through the exercise of reasonable diligence . . . ." Id. See also United States v. Pennington, 168 F.3d 1060, 1067 (8th Cir. 1999) ("[The defendant] waived [his right to challenge the seating of an allegedly biased juror] by not challenging the juror when the jury was empaneled because the basis for the objection was then known."); Fabian v. United States, 358 F.2d 187, 190-91 (8th Cir. 1966) (citing Batsell, and holding that failure to object or otherwise request an evidentiary hearing to determine if a prejudicial comment by one juror—who the judge subsequently removed for cause—tainted the rest of the jury, constituted a waiver of the right to later challenge the jury's composition).

In contrast to these cases, we have stated in ruling on a habeas case brought before us under 28 U.S.C. § 2254: "Even though the defendant failed to object to the seating of the jurors, our determination [that a biased juror violates the defendant's

Sixth and Fourteenth Amendment Rights] is not affected. When a defendant fails to object to the qualifications of a juror, he is without remedy only if he fails to prove actual bias." Johnson, 961 F.2d at 754; see also United States v. Mann, No. 11-1504, 2012 WL 2891244, at *4 (8th Cir. July 17, 2012) (applying plain error review on appeal when a defendant failed to object to allegedly prejudicial jurors during voir dire). To the extent Johnson and Mann conflict with our previous precedent concluding failure to object to an allegedly biased juror results in a waiver of a defendant's Sixth Amendment right to be tried by an impartial jury, we are bound to follow "the earliest opinion . . . as it should have controlled the subsequent panels that created the conflict." Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) (internal quotation marks and citation omitted).[5] Further, we believe this is the correct conclusion because "[i]f a defendant is allowed to . . . forego challenges for-cause to a biased juror and then allowed to have the conviction reversed on appeal because of that juror's service, that would be equivalent to allowing the defendant to plant an error and grow a risk-free trial." United States v. Brazelton, 557 F.3d 750, 755 (7th Cir. 2009) (internal quotation marks and citations omitted). See also United States v. Diaz-Albertini, 772 F.2d 654, 657 (10th Cir. 1985) ("[A] defendant, by accepting a jury, waives his right to object to the panel."); United States v. Harris, 530 F.2d 576, 579 (4th Cir. 1976) ("Where the basis for a challenge to a juror could be timely shown the failure of the defendant to object at the inception of the trial constituted a waiver of his right to challenge the composition of the jury."); United States v. Ragland, 375 F.2d 471, 475 (2d Cir. 1967) ("Failure to object to the

_____

[5]The concurrence notes that Olano may have suspended "our need to treat a case such as Batsell as binding the circuit today." Post at 1. Even if this is true, we note that both Pennington, 168 F.3d 1060, and Mann, 2012 WL 2891244, were both decided post-Olano. As such, to the extent Pennington—concluding the defendant waived his juror bias issue when he failed to object at the time the jury was empaneled "because the basis for the objection was then known," 168 F.3d at 1067—conflicts with Mann, Pennington should have controlled. Mader, 654 F.3d at 800. We further note Pennington's holding is consistent with the pre-Olano rule laid out in Batsell, which should have bound subsequent decisions.

composition of the jury has long been held to result in a waiver of the right of the accused to be heard by an impartial jury."); Cf., United States v. Brown, 634 F.3d 435, 440 (8th Cir. 2011) ("Because we find no evidence of Brown objecting during the voir dire process, with Brown's actual acceptance of the jury, we find Brown's untimely [Batson] challenge waived.")

In this case, Juror S.R.'s alleged bias—indicating there "might be a possibility" she would find law enforcement officers more credible—could not have been more plain to Johnson's counsel. In fact, it was Johnson's counsel who elicited this response from Juror S.R., and Johnson's counsel who failed to fully rehabilitate Juror S.R. Recall, Juror S.R. did not speak up when the district court asked if any of the jurors had family members involved in law enforcement. Rather, it was not until Johnson's counsel asked the panel members if anyone had any *close friends* involved in law enforcement that Juror S.R. raised her hand. Under these circumstances, we conclude the basis of Johnson's objection to Juror S.R.'s bias was clearly known during voir dire and his counsel's failure to object constituted a waiver of Johnson's right to now challenge the seating of Juror S.R. on direct appeal.

B. Sufficiency of the Evidence

Johnson argues the government presented insufficient evidence to convict him of count two, that he in fact distributed 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. Specifically, Johnson claims that "the government did not offer any evidence of the physical appearance of the substance involved in the transactions, not evidence that the substance in the transactions produced the expected effects when sampled by someone familiar with the illicit drug, nor any opinion testimony as to the identity of the alleged substance in the transaction." Appellant's Br. at 14-15.

"We review de novo the sufficiency of the evidence and view that evidence in the light most favorable to the verdict, giving it the benefit of all reasonable inferences." United States v. Honarvar, 477 F.3d 999, 1000 (8th Cir. 2007). "Evidence supporting a conviction is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Boesen, 491 F.3d 852, 856 (8th Cir. 2007) (internal quotation marks and citation omitted). "We do not weigh the evidence or assess the credibility of the witnesses. The jury has the responsibility of resolving conflicts or contradictions in testimony, and we resolve any credibility issues in favor of the verdict." United States v. Ali, 616 F.3d 745, 755 (8th Cir. 2010) (internal citation omitted).

The bulk of the evidence supporting the type of drug Johnson distributed came from the testimony of Jordan Magrum. Magrum testified he had been using methamphetamine for most of his adult life. And, he had previously been convicted of possession with intent to distribute methamphetamine. At trial, Magrum explained he met Johnson early in 2009, they had smoked methamphetamine together, and then Magrum began obtaining one to two ounces of methamphetamine from Johnson multiple times a week to sell. When Magrum ran out, he would obtain more. Magrum testified he did this continually, with the exception of a few stretches when he was out of town, from February 2009 until near Father's Day in June 2009. Further, Johnson himself admitted to officers and during his own testimony at trial to both selling and receiving methamphetamine from Magrum—Johnson simply denied the *quantity* Magrum had claimed.

The law of our circuit does not require the government to prove the existence of a controlled substance by direct evidence. United States v. Meeks, 857 F.2d 1201, 1204 (8th Cir. 1988). "It is well established in this circuit that the identity of a controlled substance can be proven beyond a reasonable doubt by circumstantial evidence and opinion testimony." United States v. Cole, 537 F.3d 923, 927 (8th Cir. 2008). "Circumstantial evidence may also include the name by which members of a

-11-

conspiracy referred to the substance." United States v. Westbrook, 896 F.2d 330, 336 (8th Cir. 1990); see also United States v. Brown, 499 F.3d 817, 823-24 (8th Cir. 2007) (accepting witness testimony the substance in question was crack cocaine as proper circumstantial evidence because "as an admitted former addict, [the witness] was somewhat of an expert on the subject").

Here, in light of Magrum's testimony as a former addict and his past convictions for dealing methamphetamine—as well as Johnson's own admissions—we find there was sufficient evidence for the jury to conclude that Johnson distributed methamphetamine to Magrum. See United States v. Collins, 690 F.2d 670, 673 (8th Cir. 1982) ("Although the prosecution relied heavily upon informer testimony and circumstantial evidence to prove its case against [the defendant], it was within the jury's prerogative and power to convict [the defendant] on such evidence.")

Johnson also claims the evidence was insufficient to prove the *amount* of methamphetamine he distributed—i.e., at least 500 grams. Magrum's testimony similarly formed the basis for the amount of methamphetamine charged in count two. After Magrum explained he received one to two ounces several times a week from February 2009 until June 2009, he said "my best estimate [of the total amount of methamphetamine I received from Johnson] would be, I'd say, at least at a minimum two pounds." Johnson calls this mere speculation, and claims it may not form the basis of his conviction.

We have previously held that under Federal Rule of Evidence 701 "a lay witness may testify about facts within his or her range of generalized knowledge, experience, and perception." United States v. Espino, 317 F.3d 788, 797 (8th Cir. 2003). In Espino, we found the district court did not abuse its discretion in admitting "specific testimony from witnesses, who all had substantial experience in the use and trade of illegal drugs, regarding the weight of the methamphetamine [the defendant]

sold." Id. at 798. Similarly here, Magrum testified based on his knowledge and experience as a methamphetamine user and seller. Magrum conservatively estimated he had received at least two pounds of methamphetamine from Johnson. One pound equals 453 grams, thus two pounds would total over 900 grams, well above the 500 gram threshold required to find Johnson guilty of count two. Accordingly, the evidence presented at trial was sufficient to find Johnson guilty of count two.

## C. Sixth Amendment Confrontation Clause

At trial, the government called to the stand lab analyst Focke, who was the person who had analyzed the samples of allegedly controlled substance found in Johnson's truck and on his body. On appeal, Johnson claims that by failing to call lab technician Schneider, who checked the evidence in and out of the lab, and forensic supervisor Jacobson, who certified the report as a true and correct copy of the original report, the government violated his Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "This [constitutional] provision bars [the] 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" United States v. Tenerelli, 614 F.3d 764, 772 (8th Cir. 2010) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)).

When a defendant fails to "raise a Confrontation Clause objection at trial, we review his claim for plain error." Tenerelli, 614 F.3d at 772. Further, such an objection must adequately put the district court and the prosecution on notice of the grounds on which the defendant meant to object. See, e.g., United States v. Jewell, 614 F.3d 911, 924 n.6 (8th Cir. 2010) ("[The defendant] did not object to [the admission of tax returns] except as to relevancy, so we review [his] claim [their admission violated his Sixth Amendment Confrontation Clause rights] for plain error only."); Ali, 616 F.3d at 751 ("Our review is limited to plain error because [the defendant] failed to object to the exhibit on the basis of the Confrontation Clause.");

-13-

United States v. Rodriguez, 484 F.3d 1006, 1013 (8th Cir. 2007) ("Because [the defendant] did not raise a Confrontation Clause objection to this testimony at trial, we review his claim for plain error.").  In this case, we find Johnson's objections to the admission of Exhibits 1–6 (the methamphetamine found at Johnson's property) and Exhibit 28 (the lab report) on grounds of chain of custody, lab testing methods, and security at the lab, were insufficient to alert the court he meant to object on Confrontation Clause grounds.  We therefore apply plain error review to his claim. "Plain error review requires [Johnson] to show that (1) there was an error that was not affirmatively waived, (2) the error was plain, meaning clear and obvious, (3) the error affects his substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Ali, 616 F.3d at 752 (internal quotation marks and citations omitted).

First, we find that the government's decision not to call Jacobson—the lab supervisor who certified the lab report exhibit as a true copy of the original—did not violate Johnson's Confrontation Clause rights.  "[C]ertificates of authenticity presented under Rule 902(11) are not testimonial." United States v. Yeley-Davis, 632 F.3d 673, 680 (10th Cir. 2011); see also United States v. Ellis, 460 F.3d 920, 927 (7th Cir. 2006) (holding that a "written certification attesting to the authenticity of a business record" was non-testimonial under Crawford); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005) (holding that "a routine certification by the custodian of a domestic public record . . . [is] not testimonial in nature"); cf. United States  v. Watson, 650 F.3d 1084, 1090 (8th Cir. 2011) (rejecting a Confrontation Clause argument stating:  "Further, pursuant to Rule 902(4), the records were certified as correct by Moore, who also stated that he was the legal custodian of the records and that he had compared the certified copies to their originals.  This suffices to establish that the records were what they purported to be, fulfilling the purpose of our inquiry into the authentication of the documents in the penitentiary packet.") (internal quotation marks and citation omitted).  In this case, because the purpose of Jacobson's certification was to attest that the copy of the crime lab report was a true copy of the

original—and not to prove the facts of the report's contents—we conclude the certification itself was not testimonial and therefore did not violate Johnson's Sixth Amendment right to confront witnesses against him. Moreover, as for the contents of the report, Johnson had the opportunity to question the maker, Focke.

Second, we find that the notations on the lab report by technician Schneider indicating when she checked the methamphetamine samples into and out of the lab—while relevant to the question of chain of custody—were not the kind of testimonial statements "offered or admitted to prove the truth of the matter asserted." Rodriguez, 484 F.3d at 1013. And, chain of custody alone does not implicate the Confrontation Clause. See Melendez-Diaz v. Mass., 129 S.Ct. 2527, 2532 n.1 (2009) ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While . . . it is the obligation of the prosecution to establish the chain of custody, this does not mean that everyone who laid hands on the evidence must be called. . . . [G]aps in the chain of custody normally go to the weight of the evidence rather than its admissibility.") (internal quotation marks and citations omitted).

The chain of custody does not have to be perfect. All that is required is testimony that the evidence in question was the same as that involved in the offense and that it is substantially unchanged. United States v. Robinson, 617 F.3d 984, 990 (8th Cir. 2010). Evidence is admissible if there is a reasonable probability it has not been changed or altered. Id. There is a presumption of integrity of physical evidence absent a showing of bad faith, ill will, or tampering with the evidence. Id. In this case, Agent Bernier testified that Exhibits 1–6 were items he had seized from Johnson and taken to the lab. Focke testified to the evidence handling procedures and that Exhibits 1–6 were those he had tested on two separate occasions. Their testimony was sufficient to establish a reliable chain of custody.

-15-

We also question whether by introducing the lab report, which included Schneider's and Jacobson's signatures, the government made the chain of custody to be "crucial," thereby requiring live testimony. In Melendez-Diaz, the Supreme Court cautioned that "[i]t is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live." 129 S.Ct. at 2532 n.1. While it is true the government submitted a copy of the lab report into evidence, and asked Focke to explain general laboratory procedures for receiving evidence and whether he believed those procedures were followed in this case, the prosecution did not extensively question Focke regarding chain of custody details. Instead, it was the defense who repeatedly raised the chain of custody and lab security issues, noting there were twenty-four or twenty-five people who would have had access to the evidence. We therefore hesitate to label this as the kind of case the Supreme Court was referencing when it noted that the prosecution may sometimes deem "the chain of custody crucial so as to require evidence." Id.; see also United States v. Summers, 666 F.3d 192, 197-201 (4th Cir. 2011) (distinguishing Bullcoming v. New Mexico, 131 S. Ct. 2705, 2713-16 (2011) and Melendez-Diaz, 129 S.Ct. at 2531-32, and finding no Confrontation Clause violation when DNA analyst supervisor alone testified, and government did not put on each witness who handled the defendant's jacket).

In any event, our inquiry into whether the government deemed the chain of custody to be so crucial as to require evidence need not proceed any further because even if Johnson had convinced us there was error, the admission of the lab report did not seriously affect the fairness, integrity or public reputation of judicial proceedings. First, the lab report and the exhibits only support the analyst's testimony that—based on Focke's own analysis—the substances recovered on Johnson and at his property were methamphetamine. Further, Johnson himself admitted that the substances the officers had recovered were indeed methamphetamine. Recall, Johnson's defense was that he had been sitting in his truck contemplating burning the methamphetamine when the officers arrived. In fact, Johnson's attorney asked the jury to find Johnson

-16-

innocent of intent to distribute because, although he was in possession of methamphetamine, he did not *intend* to distribute it; rather, he had planned to burn it. In light of this admission, we would be hard-pressed to conclude the alleged plain error—denying Johnson the opportunity to confront witnesses testifying the substance was methamphetamine—calls for a new trial.

III

For the foregoing reasons, we affirm the district court.

MELLOY, Circuit Judge, Concurring in Part.

I concur in the judgment. I also concur in the majority opinion in all respects other than those portions of section II.A. that categorically reject the possibility of applying plain error review to an unpreserved voir dire issue concerning juror partiality. I would limit today's holding refusing to apply plain error review narrowly to the facts of this case.

The majority cites Batsell v. United States, 217 F.2d 257 (8th Cir. 1954), for the proposition, "The right to challenge the panel or to challenge a particular juror may be waived, and in fact is waived by failure to seasonably object." Id. at 260. The court refers to this waiver as a "conclusive waiver" and states that, "by failing to object or otherwise elect to remove Juror S.R. using a peremptory challenge during voir dire, Johnson 'intentionally relinquished or abandoned a known right.'" Supra at 8. I write separately because I believe that, in light of United States v. Olano, 507 U.S. 725, 733 (1993), there exists no bright-line rule precluding the application of plain error review in situations involving unpreserved voir dire issues. See, e.g., United States v. Mann, No. 11-1504 (8th Cir. July 17, 2012) (applying plain error review to an unpreserved challenged based upon purported juror partiality). I believe instead that the intervening Supreme Court precedent and the clarity that has been

-17-

brought to our law since <u>Olano</u> suspends our need to treat a case such as <u>Batsell</u> as binding the circuit today.  See, e.g., <u>United States v. Lewis</u>, 673 F.3d 758, 761 n.1 (8th Cir. 2011) (stating in a different context that, "Any suggestion . . . that counsel may waive, as opposed to forfeit, a defendant's right . . . merely by failing to object . . . does not survive <u>Olano</u>.").  Here, the first-in-line rule of our court for addressing intra-circuit splits, as announced in <u>Mader v. United States</u>, 654 F.3d 794, 800 (8th Cir. 2011) (en banc), simply does not apply; the Supreme Court has broken our arguable chain of authority.

On the limited facts of the present case, however, I believe it is sufficiently clear that Johnson's counsel identified and addressed the issue of possible bias to infer an actual waiver rather than a mere forfeiture.  Arguably, there was inadequate rehabilitation of Juror S.R. given the fact that she admitted a possible bias and that her attempted rehabilitation did not amount to a firm statement of impartiality. See <u>United States v. Amerson</u>, 938 F.2d 116, 118 (8th Cir. 1991) (abrogated on other grounds) ("When jurors express this kind of bias, the district court must either excuse the jurors for cause, or by instructions and additional questions convince the jurors that there is no special credence due the testimony of police officers." (internal quotation marks and alterations omitted)).  Still, as quoted by the majority, <u>supra</u> at 6, defense counsel specifically questioned Juror S.R., probed her ability to be impartial, and elected to cease the voir dire colloquy with her at a point short of full rehabilitation.  Counsel therefore not only knew of the potential impartiality, but affirmatively explored the issue.  I believe this record provides adequate clarity to infer that counsel purposefully waived any challenge to Juror S.R.  As such, I agree with the majority that it is not necessary to apply plain error review in this particular case.

_____