# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1303

_____

United States of America

*Plaintiff - Appellee*

v.

Aaron William Polk

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: November 16, 2012
Filed: May 17, 2013

_____

Before SMITH, BEAM, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury found Aaron William Polk guilty of one count of conspiracy to manufacture and possess with intent to manufacture and distribute 1,000 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii), and 846.

At sentencing, the district court[1] denied Polk safety-valve relief under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a)(5) and sentenced Polk to 120 months' imprisonment, the statutory minimum. On appeal, Polk first argues that insufficient evidence exists that he intentionally joined the conspiracy and that it was reasonably foreseeable to him that the conspiracy involved 1,000 or more marijuana plants. Second, he asserts that the district court abused its discretion in not excluding certain evidence because the government committed a discovery violation. Third, he maintains that the district court abused its discretion in limiting his cross-examination of a cooperating witness. Finally, he claims that the district court erroneously denied him safety-valve relief. We affirm.

## I. *Background*

On March 5, 2010, members of the Lincoln, Nebraska Police Department (LPD) executed a search warrant on a house located at 5210 North 11th Street, Lincoln, Nebraska ("N. 11th St."). As officers approached the home, they smelled a strong odor of marijuana. Kevin Belton, a resident, opened the front door. When the door opened, the marijuana odor intensified. Inside the home, officers found Polk in an office area on the first floor. The office area's windows were covered with black trashbags. The office area contained marijuana paraphernalia. Officers also located approximately ten space heaters on the first floor of the home. And, in the workout/storage room, officers found boxes containing Polk's personal items and an open box containing marijuana. In the kitchen, also located on the first floor, officers recovered a key to the locked basement door in a kitchen island drawer. They also found a one-gallon ziplock baggie filled with marijuana, additional loose marijuana, and a Tupperware container filled with marijuana buds in kitchen island drawers.

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

In the basement, officers discovered several makeshift rooms used as a marijuana grow operation. Three rooms contained plants in different stages of growth, while another room contained the electrical system and timers. Large fans suspended from the ceiling ventilated the rooms through large silver tubing that went through holes cut through the ceiling of the basement, continued through the closet of the first floor workout room, and exited the first floor through holes cut through the ceiling and into the home's attic area. The grow lighting system was rigged to a series of ballasts that were powered by electrical lines connected directly to the exterior power cables, fed through holes drilled through a basement exterior wall, and attached to an illegal circuit breaker board. A large window in the basement was covered.

Officers seized 685 "actively growing plants" and 120 potted root stems. In addition, they seized several more very large black trashbags filled with harvested marijuana rooted stems removed from the pots. In addition to the marijuana plants and stems, officers seized 28 four-foot metal lamp shades each containing a 1,000-watt mercury light bulb; 28 corresponding electrical ballasts; venting fans; silver duct tubing; gallons of fertilizer; and gardening equipment.

Belton, the renter of the N. 11th St. residence, met and became friends with Polk in 2001. In 2007, Belton began working with Polk and his company, AW Properties, a real estate rental business that purchased properties to rent or renovate and sell. AW Properties also leased properties from third parties with an option to purchase the properties. It would then sublease the property to another party to whom it would also offer an option to purchase the home.

Polk introduced Belton to Jeff Duponte, the owner of an unfinished home at the N. 11th St. address. In March 2009, Polk arranged for Belton to rent the home from Duponte, who resided in California. Once Belton moved into the house, Polk was there on a daily basis. Polk had an office for AW Properties in the front bedroom of the home.

Approximately one month after Belton moved into the N. 11th St. home, Chien Nguyen approached him about installing a marijuana grow operation. Belton agreed to let Nguyen install the grow operation.

Nguyen and Polk originally met around June 2005 when Polk sold Nguyen a house on Normal Boulevard in Lincoln, Nebraska ("Normal Boulevard"). The two began socializing, and Nguyen confided in Polk that he was growing marijuana in the basement of his home. Nguyen told Polk that he needed to find another house to grow marijuana in that had an unfinished basement and an attached garage because his current home was unsuitable for growing marijuana. Nguyen wanted an unfinished basement so that he would have more room to grow marijuana. He wanted an attached garage so that he could move plants and dirt inside his house without his neighbors seeing him.

Polk agreed to find a house for Nguyen that satisfied his requirements. On January 10, 2006, Polk, through AW Properties, leased 2720 North 81st Street, Lincoln, Nebraska ("N. 81st St.")—a home with an unfinished basement and an attached garage—from Lorraine Prusa of Golden Investments. The monthly rent was $1,380.00, and the lease included an option to purchase the property. At the time of the lease, Polk told Prusa that he was planning to sublease the property.

Polk brought Nguyen pictures of the house on N. 81st St., telling Nguyen that "[t]his house would be great for it." Nguyen understood Polk to mean that the house would be great for growing marijuana. Polk told Nguyen that the rent was $2,000 per month and that Nguyen could have the house for three years. Nguyen did not sign a lease. When Nguyen moved in, he paid Polk $5,000, pursuant to Polk's instructions. Nguyen did not question Polk regarding what the extra $3,000 was for. Shortly after moving in, Nguyen installed a marijuana grow operation.

-4-

Nguyen paid Polk $2,000 in cash every month for the house on N. 81st St., although the payment that Polk made to Golden Investments was substantially less. Sometimes Nguyen was late paying the rent. Nguyen would inform Polk that he was waiting for money from the sale of the marijuana. On a couple of occasions, Nguyen would tell Polk that he was "waiting for [his] harvest, and after [his] harvest [he] could pay [Polk]." Polk never questioned what Nguyen meant by "harvest," and Polk was agreeable to waiting for payment. Polk would sometimes ask Nguyen "when there would be a harvest so [he] c[ould] get the rent." Polk also knew that Belton began helping Nguyen with the harvests at the marijuana grow operation at N. 81st St.

In 2007, Nguyen went to jail after pleading guilty to a misdemeanor charge of possession with intent to deliver marijuana. Prior to going to jail in July 2007, Nguyen had approximately five harvests at the N. 81st St. home. He was having harvests every two months, the first of which occurred in "early summer late fall of 2006." He harvested at least 200 plants per harvest. When Nguyen learned that he was going to jail, he shut down the marijuana grow operation at N. 81st St. After his release from jail in approximately November 2007, Nguyen resumed his marijuana grow operation at the N. 81st St. home. He had four harvests of approximately 200 plants per harvest after his release from jail.

Nguyen knew that he would have to move out of the N. 81st St. home by 2009. As a result, he made plans to expand his operation. Nguyen told Polk that he needed another house when the lease expired, and Polk informed Nguyen that he had a "better house" with the same owner who would not "check the house." Polk knew that Nguyen needed the house for his marijuana grow operation and that it needed to have an unfinished basement and attached garage. The new home that Polk found for Nguyen was located at 2620 Norman Circle, Lincoln, Nebraska ("Norman Circle"). Before Nguyen ever saw the Norman Circle home, Nguyen paid Polk $11,000 earned from his marijuana grow operation because Polk "said that's what he needs." Nguyen

liked the house and the location, but he had to wait until the current residents moved out before he could move in and start growing marijuana.

Prusa of Golden Investments entered an agreement with the owners of the Norman Circle home to rent the property. Polk learned that Prusa had the Norman Circle property for rent and told Prusa that he was interested in renting it under the terms of a lease with the option to purchase. By June 28, 2008, Polk had signed the written contract with Golden Investments in which he agreed to pay $1,650 monthly rent beginning July 1, 2008, with an option to purchase the home. Nguyen moved into the Norman Circle home between August and September 2008 after Polk told him it was okay to move in. Nguyen did not sign a lease for the home. He began his marijuana grow operation shortly after moving in.

Even though Nguyen had the Norman Circle home, he continued to operate the N. 81st St. marijuana grow operation until January 2009, paying rent to Polk for both houses. Upon the expiration of the lease, Nguyen and Belton began cleaning the N. 81st St. home. During this time, Polk came to the home to check on their progress. At that time, the basement contained "[a] whole bunch of pots around, a bunch of dirt around, . . . fifty to seventy to a hundred plants laying around . . . , small plants, maybe like five or seven inches tall, . . . just . . . laying . . . there." Polk was mad because he was scheduled to show the home soon and did not think that Nguyen and Belton could finish cleaning the home in time. Polk then asked Prusa for additional time to clean up the home. She agreed to extend the lease for another month. After Nguyen moved out, the basement floor still bore water-ring stains from the numerous large pots that had contained the marijuana plants.

The marijuana grow operation at Norman Circle was larger than the one at N. 81st St. Nguyen paid Polk cash for the rent at Norman Circle. As rent came due, Polk would ask Belton when the next harvest would occur so that he could know when to expect his money. Prior to law enforcement discovering the marijuana grow operation

at Norman Circle on March 6, 2010, Nguyen had eight harvests of 600 plants per harvest. When officers executed the search warrant on March 6, 2010, they seized 202 live plants and 429 potted stemmed root balls.

After Belton had moved into the N. 11th St. home in 2009, Nguyen talked to Polk about starting a marijuana grow operation at the home. Nguyen inquired whether Belton would be "cool" with Nguyen growing marijuana at the home and whether Nguyen could trust Belton. Polk assured Nguyen that he could trust Belton and that Belton "was cool." Nguyen approached Belton with the offer, and Belton agreed because he was in need of money. Other people were also involved in setting up the marijuana grow operation, tending to the plants, and harvesting the marijuana. As the plants neared maturity, the smell of marijuana became so strong that others in the neighborhood noticed it. Polk often commented about the odor, saying "that if you knew what the smell was, you would know what was going on here."

Nguyen began paying the $2,000 per month rent for N. 11th St. As with the other marijuana grow operations, to harvest the marijuana, the plants were cut down and mechanically processed. The machine used to harvest the plants could be heard on the first floor, as could the fans used to vent the grow rooms. Nguyen harvested the marijuana plants "four or five times before [he] got busted." Each harvest involved "five, six hundred" marijuana plants. That total did not include the 685 live plants seized from the home on March 5, 2010.

As part of their business recordkeeping, Belton and Polk maintained lists of properties that AW Properties owned or rented. They also used the records to obtain bank loans. Although Nguyen made monthly cash payments, neither N. 81st St. nor Norman Circle ever appeared on the property lists showing that they had been rented. Likewise, there were no written leases between Nguyen and AW Properties for the residents on N. 81st St. or Norman Circle, although renters of Polk's other rental properties all signed leases. The utilities for N. 81st St. and Norman Circle were in

Polk's name even though his common practice with other tenants was to have the utilities placed in the tenant's name.

Polk was charged with one count of conspiracy to manufacture and possess with intent to manufacture and distribute 1,000 or more marijuana plants, in violation of §§ 841(a)(1), 841(b)(1)(A)(vii), and 846. The jury found Polk guilty. Polk then filed motions for judgment of acquittal and a new trial. The district court denied both motions. Prior to sentencing, Polk filed a motion for safety-valve eligibility pursuant to 18 U.S.C. § 3553(f), and the government filed an objection. At sentencing, the court denied Polk safety-valve relief, concluding that Polk "has not complied with prong five of [U.S.S.G. §] 5C1.2(a)." The court concluded that Polk's "written statement and oral statement contradict[ed] the evidence presented at trial, most specifically the statement[s] of [Nguyen] and Belton that they had conversations with the defendant that fully inculpated the defendant in illegal endeavors." The court sentenced Polk to the statutory minimum of 120 months' imprisonment.

## II. *Discussion*

On appeal, Polk first argues that insufficient evidence exists that he intentionally joined the conspiracy and that it was reasonably foreseeable to him that the conspiracy involved 1,000 or more marijuana plants. Second, he asserts that the district court abused its discretion in not excluding certain evidence because the government committed a discovery violation. Third, he maintains that the district court abused its discretion in limiting his cross-examination of a cooperating witness. Finally, he claims that the district court erroneously denied him safety-valve relief.

### 1. *Sufficiency of the Evidence*

"We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Miller*, 698 F.3d 699, 702 (8th Cir. 2012) (quotation and citation omitted).

### a. *Conspiracy*

"To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Rolon-Ramos*, 502 F.3d 750, 754 (8th Cir. 2007) (quoting *United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007)). "An agreement to join a conspiracy need not be explicit but may be inferred from the facts and circumstances of the case." *United States v. Slagg*, 651 F.3d 832, 840 (8th Cir. 2011) (citations and internal quotation omitted). The government is not required to show a discrete, identifiable organizational structure. *Id.* (citing *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993); *United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir. 1988)). Moreover, a "single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." *Id.* (quoting *United States v. Longs*, 613 F.3d 1174, 1176 (8th Cir. 2010)).

*United States v. Espinoza*, 684 F.3d 766, 776 (8th Cir. 2012).

Polk does not contest that sufficient evidence exists that there was a conspiracy and that he knew of the conspiracy. Instead, he argues that the government failed to prove that he "agreed with others to manufacture and distribute marijuana" because no evidence exists that he "participated in manufacturing, harvesting, or distribut[ing] . . . the marijuana." But "[g]uilt may exist even when the defendant plays only a minor role and does not know all the details of the conspiracy." *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994). "[A] drug conspiracy may involve ancillary functions (*e.g.*, accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator." *United States v. Garcia-Torres*, 280 F.3d 1, 4 (1st Cir. 2002).

"[A] variety of conduct, apart from selling [drugs], can constitute participation in a conspiracy sufficient to sustain a conviction." *United States v. Burgos*, 94 F.3d 849, 859 (4th Cir. 1996). Therefore, Polk need not have actually manufactured, harvested, or distributed the marijuana to be a member of the conspiracy. *See, e.g.*, *United States v. Garfinkle*, 842 F. Supp. 1284, 1289 (D. Nev. 1993) ("Defendant need not have actually personally manufactured or distributed or possessed [drugs] to be a member of a conspiracy to do the same.").

A reasonable jury could infer from the evidence that Polk was an active participant in the marijuana grow operations, as he obtained and rented homes according to Nguyen's specifications to sustain the operations. After renting the homes to Nguyen, Polk would inquire when the harvests were occurring so that he would know when Nguyen would pay the rent. And, although Nguyen was making monthly cash payments, neither N. 81st St. nor Norman Circle ever appeared on the Polk's property lists showing that Polk had rented the homes to Nguyen. There were no written leases between Nguyen and Polk or AW Properties for N. 81st St. or Norman Circle, although renters of Polk's other properties all signed leases. The utilities for North 81st St. and Norman Circle also continued in Polk's name, although the common practice with the other tenants of AW Properties was to have the utilities placed in the tenant's name.

The evidence also showed that, as to the N. 81st St. home, Polk commented to Nguyen that it would be great for growing marijuana. When Nguyen moved into the home, he paid Polk $5,000 as Polk requested and never questioned the purpose for the extra $3,000. Nguyen paid Polk $2,000 in cash every month for the home even though Polk's payments to Golden Investments were substantially less. And, Polk insisted that Nguyen pay him $11,000 for the Norman Circle home before Nguyen ever saw it. Finally, Polk maintained an office at the N. 11th St. home containing a marijuana grow operation. Polk was instrumental in Nguyen recruiting Belton to establish a marijuana grow operation at N. 11th St., informing Nguyen that he could

trust Belton. Nguyen began paying Polk $2,000 per month for N. 11th St. after establishing the marijuana grow operation.

In arguing that the government failed to show that he intentionally joined the conspiracy, Polk attacks the credibility of Nguyen and Belton. But "[w]e do not weigh the evidence or assess the credibility of the witnesses. The jury has the responsibility of resolving conflicts or contradictions in testimony, and we resolve any credibility issues in favor of the verdict." *United States v. Ali*, 616 F.3d 745, 755 (8th Cir. 2010) (internal citations omitted).

In sum, we conclude that sufficient evidence establishes that Polk intentionally joined the conspiracy.

b. *Reasonable Foreseeability*

Polk also argues that insufficient evidence exists that it was reasonably foreseeable to him that the conspiracy involved 1,000 or more marijuana plants. "A defendant is liable for actions of a conspiracy that were reasonably foreseeable to him, unless he affirmatively withdraws from the conspiracy." *United States v. Marquez*, 605 F.3d 604, 611 (8th Cir. 2010). Despite not actually planting or selling the marijuana, Polk's familiarity with the marijuana grow operations enabled him to reasonably foresee the amount of marijuana that the conspiracy produced. Polk was involved in a five-year conspiracy. He knew the size of the basements that Nguyen used to manufacture the marijuana and that the operation was large enough to permit Nguyen to make cash payments of $2,000 per month plus the "finder's fees" that Polk demanded for finding Nguyen houses suitable for marijuana grow operations. Based on the most conservative estimate, Nguyen's testimony shows that the conspiracy harvested approximately 9,000 marijuana plants from the three properties. Furthermore, large amounts of marijuana were recovered in the kitchen of the N. 11th St. home and in the very rooms that Polk used.

Therefore, we conclude that sufficient evidence supports a finding that Polk could reasonably foresee that the conspiracy involved 1,000 or more marijuana plants.

## 2. *Discovery*

On March 15, 2010, the district court ordered that "[w]ithin fourteen (14) days of this date, counsel shall confer and accomplish discovery in accordance with NECrimR 16.1 and *Fed.R.Crim.P.* 16. The United States Attorney shall disclose *Brady v. Maryland* (and its progeny) material as soon as practicable."

The case proceeded to trial on September 26, 2011. During trial, Polk's counsel informed the court of the existence of a report about an interview of Nguyen from September 16, 2011, in which Nguyen discussed pre-indictment activity. Polk's counsel stated his belief that the government had provided him with the most recent interview. The court asked counsel whether there was anything "particularly surprising" to him, and counsel responded that there was. Counsel explained that "[i]t was about a conversation that [Nguyen] claims to have had with Aaron Polk while he was living in a residence on Normal Boulevard in 2005 . . . where he said that he was growing marijuana in the basement." According to counsel, this information was "something new that [he] had never seen before." Counsel alleged that, for the first time, Nguyen "started talking about a conversation that he had with Aaron Polk in 2005." Counsel indicated that he wanted to interview Nguyen. The court agreed, as it "want[ed] . . . to provide [Polk's counsel] with an opportunity to . . . interview Chien Nguyen regarding that statement." The court wanted to "ameliorate [any] surprise" by providing counsel the opportunity to interview Nguyen before he testified, "particularly if there's any argument about whether it's outside the timeframe of statute of limitations."

The next day, Polk's counsel interviewed Nguyen and learned that Nguyen was "going to say the conversation happened in 2005 on Normal Boulevard" as opposed to "2007 at North 81st." Counsel could not determine whether the statement was

-12-

outside of the scope of the statute of limitations but stated that it was outside the indictment's scope. Counsel asserted that the statement "was a total surprise." The court replied, "[I]t doesn't surprise you that Nguyen was going to testify that he had conversations with your client about acquiring grow houses for him?" Counsel responded that he knew that Nguyen was going to claim that Polk acquired houses to be used for growing marijuana but that Nguyen was now going to testify that it happened on an earlier date. The court questioned what harm Polk suffered because of the difference, and counsel responded:

> Because it's now prior to the first house that he says he acquired through Aaron Polk, the one on North 81st Street, and before it was while he was already in the North 81st Street house, so I think it's clearly prejudicial.
>
> It adds another house to his claim that wasn't there before.

The court stated its belief that prejudice would result to Polk if this was the first time that Nguyen was "com[ing] up with 81st [S]treet as part of this conspiracy." After an extensive exchange with counsel in which each gave their views on when Nguyen told investigators that he acquired the N. 81st St. house to grow marijuana, the court stated its conclusion that Polk received adequate notice "that Nguyen was going to say that the North 81st Street house was purchased as a consequence of Polk's desire to assist Nguyen in finding a home that was suitable for growing marijuana." The court explained that "the premise that the 81st Street home was facilitated for purposes of growing marijuana had been provided to [Polk] on" January 27, 2011. Although the court acknowledged that the January 2011 report "as transcribed by [the] [o]fficer . . . is to some degree ambiguous, particularly about when this conversation took place," the court was "satisfied that[] it's fair to conclude from this statement that the 2720 North 81st Street was—that Nguyen was saying that home was purchased with Polk's help, because Polk . . . knew that Nguyen was going to be growing dope there." The court declined to exclude the testimony. The court recognized Polk's continuing objection based on surprise and improper variance.

-13-

On appeal, Polk asserts that the primary witness against him—Nguyen—was permitted to testify over Polk's objection about a conversation that Nguyen claimed to have had with Polk. Polk argues that the district court erroneously failed to exclude that testimony, as it was not timely provided in discovery, resulted in unfair surprise at trial, and changed a key piece of evidence in the alleged conspiracy.

> We review for abuse of discretion a district court's decision regarding the exclusion of evidence as a sanction for governmental discovery violations. *United States v. Pherigo*, 327 F.3d 690, 694 (8th Cir. 2003). If an actual discovery violation exists, the sanction will be upheld or reversed based on "(1) whether the Government acted in bad faith and the reason(s) for delay in production; (2) whether there is any prejudice to the defendant; and (3) whether any lesser sanction is appropriate to secure future Government compliance." *Id.*; *see, e.g.*, *United States v. Sandoval-Rodriguez*, 452 F.3d 984, 989–90 (8th Cir. 2006) (finding no discovery violation and then assuming a violation to discuss the three factors).

*United States v. Altman*, 507 F.3d 678, 680 (8th Cir. 2007).

> Federal Rule of Criminal Procedure 16(a)(2) provides:

> Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of *reports,* memoranda, or other internal government documents *made by* an attorney for the government or other *government agent in connection with investigating or prosecuting the case*. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

(Emphases added.)

In turn, § 3500(a)–(b) provides:

(a) In any criminal prosecution brought by the United States, *no statement* or *report* in the possession of the United States *which was made by a Government witness* or prospective Government witness (other than the defendant) *shall be the subject of* subp[o]ena, *discovery*, or inspection *until said witness has testified on direct examination in the trial of the case*.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(Emphases added.)

"Reports, memoranda, or other internal government documents created by a government agent in connection with the investigation or prosecution of the case are immune from discovery." *United States v. Robinson*, 439 F.3d 777, 779–80 (8th Cir. 2006) (quotations, alteration, and citations omitted). "A federal criminal defendant generally has no right to know about government witnesses prior to trial." *Altman*, 507 F.3d at 680 (citing 18 U.S.C. § 3500; Fed. R. Crim. P. 16(a)(2); *Sandoval-Rodriguez*, 452 F.3d at 990).To comply with due process, the government need only "disclose all material or potentially exculpatory evidence before the trial ends." *Id*.

Here, a government agent created the September 16, 2011 report in connection with the investigation of conspiracy to distribute marijuana. "[T]he agent's notes [do not] qualify as Rule 16 material because [they] constitute the agent's impression of his interview with [Nguyen], not a statement by [Nguyen]." *See United States v.*

-15-

*Malone*, 49 F.3d 393, 396 (8th Cir. 1995). Moreover, the government disclosed the September 16 report to Polk three days later on September 19, 2010. Following the disclosure, Polk had seven days prior to trial to prepare for Nguyen's testimony, and the court provided Polk's counsel with the opportunity to—and Polk's counsel did—interview Nguyen about material contained in the September 16 report. *See Altman*, 507 F.3d at 680 ("As it was, the defense had at least four full days prior to trial to prepare to meet Cyrus's testimony, and thus the district court abused its discretion by excluding Cyrus's testimony as untimely disclosed."). Therefore, we hold that the district court did not abuse its discretion by declining to exclude Nguyen's testimony stemming from the September 16, 2011 police interview of Nguyen because no discovery violation occurred.

### 3. *Cross-examination*

Polk next contends that the district court erred in limiting his counsel's cross-examination of Nguyen regarding a police interview unrelated to the present case. During cross-examination, Polk's counsel asked Nguyen the following question: "Although none of the statements that you gave *in this case* were recorded, you did give a statement in 2006 that was recorded? Do you remember that?" (Emphasis added.) The government objected based on relevancy. The court sustained the objection. Out of the jury's presence, the court inquired about "the recorded statement in 2006." Polk's counsel replied:

> [Nguyen] gave a recorded statement to an officer who arrested him on September 16, 2006, for the grow that he was conducting at 33rd and X Street and it gives us an example of how this witness answers questions when he's being questioned by a police officer.
>
> When a police officer asks him a question, he asks the police officer am I supposed to say yes or no? That's his answer. He asks the police officer to tell him what to say.

The court then asked for "some context" as to when the statement was taken, by whom, and where. Polk's counsel responded:

> [Nguyen] was in custody. It was Officer Tucker of the Lincoln Police Department.
>
> Officer Tucker's question was, after advising him of his rights, knowing your rights in this matter, everything I just read to you, are you willing to answer some questions or make a statement to me now?
>
> And his answer was, "Am I supposed to say yes or no?"
>
> The officer said, "You are supposed to say yes or no."
>
> Chien [Nguyen] said, "Yes, right?", asking the officer if that was the right answer.
>
> And then Chien [Nguyen] said, "I am supposed to say yes, right?"
>
> That's just an example of it.

The court concluded that the statement was not relevant and, even if it were, it was unfairly prejudicial explaining:

> It doesn't have anything to do with this case. It has to [do] with the vagaries of administering the Miranda rights to a non-native English speaker and I don't think it meaningfully bears on his credibility so the objection is sustained.

Polk contends that the district court erroneously limited his cross-examination of Nguyen, preventing him from discrediting Nguyen and resulting in a violation of Polk's right of confrontation under the Sixth Amendment. According to Polk, the September 16, 2006 interview "was the only available example [he] could use to demonstrate how Nguyen responds to police questions" because the government did

not record any of Nguyen's four interviews in the present case. Polk claims that the district court's ruling "restricting Polk's examination of Nguyen deprived Polk of an opportunity to provide the jury with an accurate portrayal of Nguyen's credibility as a government witness."

> The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Although the Sixth Amendment guarantees a defendant an opportunity for effective cross-examination of witnesses, that right is not unfettered. *See United States v. Dale*, 614 F.3d 942, 956–57 (8th Cir. 2010), *cert. denied*, ___ U.S.___, ___, 131 S. Ct. 1814, 179 L. Ed. 2d 774, 775 (2011); *United States v. Wipf*, 397 F.3d 677, 682 (8th Cir. 2005) ("The United States Supreme Court has emphasized that 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (per curiam))). "[D]istrict courts 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" *Dale*, 614 F.3d at 956 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). To state a viable Confrontation Clause challenge to the district court's decision to limit cross-examination, the defendant must establish "that a reasonable jury might have received a *significantly* different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination." *Id*. at 957 (emphasis added). A trial court's decision to limit cross-examination will not be reversed unless there has been a clear abuse of discretion and a showing of prejudice to the defendant. *See United States v. Love*, 329 F.3d 981, 984 (8th Cir. 2003).

*United States v. Petters*, 663 F.3d 375, 381–82 (8th Cir. 2011).

Here, the district court imposed a reasonable limit on Polk's cross-examination of Nguyen because of marginal relevance and potential prejudice. First, as Polk admits on appeal, the September 16, 2006 recorded statement was wholly unrelated to the present conspiracy. Second, Polk's counsel wanted to cross-examine Nguyen on his answers during this unrelated *Miranda* rights advisement, not about his substantive answers about marijuana distribution. Third, Polk has failed to prove that allowing his counsel to cross-examine Nguyen on his answers to this interview would have provided the jury with a significantly different view of Nguyen or his credibility. The record reflects that Polk's counsel cross-examined Nguyen about his prior criminal history, his cooperation with the government to obtain a lighter sentence, his status as a drug user, and his prior inconsistent statements. As a result, we conclude that the district court did not err in limiting the cross-examination of Nguyen regarding a police interview in an unrelated matter.

### 4. *Safety-Valve Eligibility*

Prior to sentencing, Polk had written a statement, which he claimed was a truthful and complete disclosure of all the information and evidence about the conspiracy. He also gave a safety-valve interview to Sergeant William Koepke of the LPD. Polk offered his written statement and a copy of the audio recording of the safety-valve interview as evidence that he had complied with all the safety-valve provisions.

During the sentencing hearing, Sergeant Koepke explained why he did not believe that Polk "was presenting a completely truthful statement to [him]." He noted that "Polk would dissect the question and attempt to hang his hat on a certain aspect of that question." As an example, he cited Polk's refusal to "acknowledge the fact that he knew Mr. Nguyen was living at Turtle Creek apartments," not at the houses that Nguyen had rented from Polk. Sergeant Koepke expressed his belief that Polk was "being evasive." He identified "nonverbal clues" as evidence of evasiveness, pointing out that Polk's counsel had to direct him to "answer the question." Sergeant Koepke

also identified inaccuracies in Polk's written statement. For example, Polk claimed "that Chien Nguyen was living at 2750 Apple," and Sergeant Koepke was unable to corroborate the truthfulness of that claim. "Officers showed the occupant that lived there a photo of Mr. Chien Nguyen," and the occupant "said he had lived there for two years and he hadn't observed him." Additionally, Prusa never identified "Polk as being a manager for her, for the North 81st Street property." And, contrary to Polk's claim "that there are text messages from Chien Nguyen regarding apologizing about Norman Circle," no such text messages were ever found. Sergeant Koepke also discovered that Polk was untruthful in claiming "that he was held for 46 hours on the weekend before he was allowed out of his cell and able to use the phone." After reviewing Polk's written statement, Sergeant Koepke did not believe that it "was a truthful statement of Mr. Polk's involvement and all knowledge he had regarding the offense." Sergeant Koepke also testified that, following his interview with Polk, he did not believe that Polk had provided a truthful statement about his participation in the offense and all information known to him "based on the information that [Sergeant Koepke] had from the trial, that [he] had from the investigation."

Following testimony, the court recessed to listen to the recording of the safety-valve interview. After listening to the recording, the district court denied Polk's safety-valve motion, explaining:

> I deny the safety valve motion because the defendant has not complied with prong five of United States Sentencing Guideline [§] 5C1.2(a).
>
> Specifically the defendant falsely denied his knowledge that Chien [Nguyen] and Belton were in a large scale marijuana growing operation which he, the defendant, was aiding by providing middle-class homes where marijuana could be grown without fear of discovery.
>
> Why do I believe the defendant isn't truthful? Two examples are illustrative, although I could give many more.

During the safety valve interview when asked, "What did you think Chien [Nguyen] was doing?"

The defendant answered, "I didn't think about it."

Given the defendant's superior intellectual ability and his business acumen such an answer, to put it bluntly, is ridiculous.

As a further example, the defendant's written statement and oral statement contradicts the evidence presented at trial, most specifically the statement[s] of Chien [Nguyen] and Belton that they had conversations with the defendant that fully inculpated the defendant in illegal endeavors.

I believe that Chien [Nguyen] and Belton told the truth, and I further believe the defendant's denial to be untruthful. I therefore deny the motion.

On appeal, Polk argues that the district court erroneously denied him safety-valve relief because it incorrectly rejected his safety-valve statement as not credible.

"We review the district court's application of § 5C1.2 de novo and its factual findings for clear error." *United States v. Jackson*, 552 F.3d 908, 909 (8th Cir. 2009) (per curiam).

The safety valve provision under section 5C1.2 "applies to first-time non-violent drug offenders who meet certain requirements." *Deltoro-Aguilera v. United States*, 625 F.3d 434, 437 (8th Cir. 2010).[2]

---

[2]We have previously explained that

[t]he safety valve requires that: (1) the defendant does not have more than one criminal history point; (2) the defendant did not use violence or a credible threat thereof or possess a dangerous weapon in the commission of the crime; (3) the offense did not result in anyone's death

-21-

The only requirement at issue is whether, "not later than the time of the sentencing hearing, [Polk] . . . truthfully provided to the Government all information and evidence [Polk] ha[d] concerning the offense." USSG § 5C1.2(a)(5).

"Defendants have the burden to show affirmatively that they have satisfied each requirement for the safety valve, including whether truthful information and evidence have been given to the government." *United States v. Alvarado-Rivera*, 412 F.3d 942, 947 (8th Cir. 2005) (en banc); *see United States v. Razo-Guerra*, 534 F.3d 970, 974 (8th Cir. 2008) ("[Defendant] bore the burden at the sentencing hearing of establishing each of the five requirements for safety valve relief . . . .[T]he Government had no burden to put on any evidence concerning [defendant's] eligibility for safety valve relief."). Eligibility must be demonstrated by a preponderance of the evidence. *United States v. Sanchez*, 475 F.3d 978, 980 (8th Cir. 2007).

*Garcia*, 675 F.3d at 1094 (second, fourth, fifth, sixth, seventh, and eighth alterations in original).

Here, the district court did not clearly err in its assessment that Polk failed to truthfully provide to the government all information and evidence that Polk had concerning the offense. As the district court observed, Polk never admitted to participating in the conspiracy, which is contrary to the jury's verdict and trial

---

or serious injury; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense; and (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the government all information and evidence the defendant has concerning the offense.

*United States v. Garcia*, 675 F.3d 1091, 1094 n.3 (8th Cir. 2012) (quotation ad citation omitted).

evidence. Sergeant Koepke's testimony explaining why Polk was untruthful, along with the district court's own review of the recording of the safety-valve interview, provides a sound basis for the district court's denial of the motion.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____