# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3419
_____

United States of America

*Plaintiff - Appellee*

v.

Robert Edward Maloney

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 20, 2023
Filed: May 24, 2024

_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Robert Maloney was convicted at a jury trial of one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, based on his role in a Minnesota-based drug distribution ring. The district

court[1] sentenced him to 262 months' imprisonment, followed by 5 years of supervised release. Maloney appeals, asserting that the district court (1) erroneously limited cross-examination of the Government's key witness, in violation of the Confrontation Clause; (2) erroneously denied Maloney's request to represent himself during closing argument; (3) erroneously denied Maloney's request for discovery sanctions based on the Government's alleged failure to produce the audio recordings of phone conversations that formed the linchpin of the Government's case; and (4) violated his Sixth Amendment right to a speedy trial. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Maloney's conviction arises from his conduct in orchestrating the sale of large quantities of methamphetamine while he was serving a sentence in a Minnesota state prison for a terroristic-threatening conviction. In early 2019, an investigation into Maloney's drug operation began when a confidential informant told law enforcement about a prisoner housed in a specific Minnesota correctional facility who was communicating with two people who were not incarcerated to traffic methamphetamine throughout the state. After reviewing recorded prison phone calls, law enforcement identified the incarcerated individual as Maloney. In the recorded phone calls, Maloney discussed purchasing 19 pounds of methamphetamine through a supply source who was incarcerated with him. Maloney coordinated with his girlfriend, Sara Lahr, and another individual, Senif Garza, to store and distribute the methamphetamine. Law enforcement conducted a controlled buy between Lahr and the informant, and, in April 2019, acting on a separate tip, law enforcement officers searched Garza's residence, recovering roughly three pounds of methamphetamine that Garza had been storing for Maloney. After seizing these drugs, law enforcement worked with Garza's girlfriend to conduct a controlled exchange of cash and methamphetamine with Lahr. Based on

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

this investigation, in November 2020, a grand jury indicted Maloney, Lahr, and Garza, on one count of conspiracy to distribute controlled substances.

After Maloney made his first appearance and was arraigned in December 2020, the district court entered a scheduling order, which, as relevant here, ordered discovery disclosures to be made by January 5, 2021, and set trial for March 2021. On January 5, 2021, the Government made its disclosures pursuant to Federal Rule of Criminal Procedure Rule 16(a). The Government included an index of the disclosures and noted that "any and all physical evidence, including audiotapes or videotapes, are available for your review at a mutually agreeable time after making proper arrangements with the custodial law enforcement agent." The Government also produced audio files of the recorded phone calls that Maloney made from prison.

On January 14, 2021, Maloney's counsel filed a motion for a 60-day continuance, specifically referencing the pretrial-motions deadline and counsel's need for additional time to review the evidence, to communicate with Maloney—which had been made more difficult by restrictions that had been put in place at the correctional facility due to the COVID-19 pandemic—and to participate in discussions with the Government. The district court granted the motion. No additional motions were filed until March 11, 2021, when Maloney's counsel filed a motion to withdraw, which the district court granted based on counsel's conflict of interest. On March 26, 2021, Maloney was appointed new counsel, who, on March 31, 2021, notified the Government for the first time that he was unable to listen to the audio files that the Government had provided to Maloney's original counsel.[2]

---

[2]The inability of Maloney and his counsel to listen to the audio recordings was the result of technical issues. The audio recordings required the use of proprietary software. After Maloney's counsel notified the Government of his inability to access the audio files, the Government provided Maloney's counsel with the necessary software component and application to access the files. Maloney's counsel was able to access the files, but Maloney remained unable to listen to the audio files on a jail computer. The Government, working with the IT staff at the jail, was ultimately

The parties communicated about the problems in listening to the audio files for over a month without being able to resolve the issue. During this period, Maloney's counsel also filed a motion for a two-week extension of the motions deadline on the basis that he needed additional time to review discovery due to his recent appointment and that the audio recordings of the prison phone calls were not working. The district court granted the motion.

On April 30, 2021, Maloney's counsel filed a motion for discovery sanctions, arguing that the Government's failure to produce audio files that the defense could listen to violated the Government's disclosure obligations under Rule 16(a). Maloney's counsel argued that, because the recorded phone calls were the most significant evidence in the case, the indictment should be dismissed. In the alternative, Maloney's counsel asked the district court to exclude the recordings, along with any evidence derived therefrom. While this motion was pending, the parties were able to resolve the technical issues, and Maloney's counsel was able to listen to the audio files on May 5, 2021. The parties further communicated about Maloney's inability to listen to the files, and after some difficulties, Maloney himself was able to begin listening to them on May 28, 2021, ten months before trial commenced.

A magistrate judge ruled on the motion on July 30, 2021, denying Maloney's request for sanctions. The magistrate judge concluded that the Government did not violate Rule 16(a) because it properly disclosed and made available for inspection all the physical evidence, including the audio files, by the January 5, 2021 deadline. The magistrate judge acknowledged that the defense faced technical difficulties in listening to the audio files but noted that there was no evidence that the Government intentionally or negligently caused these issues. Because the magistrate judge concluded that no discovery violation had occurred, he declined to analyze the proposed sanctions or to consider the prejudice to Maloney. Maloney objected to

---

able to load all the audio files onto a laptop that Maloney was able to use to listen to the recordings.

the magistrate judge's order, but the district court overruled the objection and affirmed the order.

The matter proceeded until, on September 7, 2021, Maloney filed a pro se motion for substitution of counsel, alleging a conflict of interest, lack of communication, irreconcilable differences, and ineffective assistance of counsel. The magistrate judge conducted a hearing and, on October 28, 2021, granted the motion. The district court thereafter set a trial date of January 31, 2022. When Maloney's third attorney was appointed on November 16, 2021, he filed a motion to continue the motions deadlines and the trial date, seeking a 60-day continuance to allow him to familiarize himself with Maloney's case and prepare for trial. The district court granted the motion and reset the trial for April 4, 2022.

A week before trial, the district court held a pretrial conference where Maloney's counsel alerted the district court that, at some point during the trial, Maloney might wish to represent himself. In response, the district court told Maloney that, if he chose to represent himself, the district court would work to ensure that Maloney understood his rights. Specifically, the district court explained that it would pause the trial in such an event and have a hearing outside the presence of the jury to explain Maloney's rights and determine whether Maloney understood what he was choosing to do by representing himself. The district court reaffirmed that self-representation was Maloney's constitutional right, and that the exercise of the right would be entirely up to Maloney.

The five-day trial began on April 4, 2022. The Government called Sara Lahr as one of its witnesses. Lahr testified about her relationship with Maloney, the phone calls they exchanged while Maloney was incarcerated, and her role in the conspiracy. Lahr also testified that Maloney would give her instructions, often over the phone, and discussed the code words that Maloney used to refer to the methamphetamine. Before Maloney's counsel cross-examined Lahr, counsel asked the district court to rule on two topics he intended to question Lahr about. As relevant to this appeal, he sought to question Lahr about statements she allegedly made "in a drug and trauma

-5-

induced memory," namely, that she had been present during the assault and murder of Jacob Wetterling, a famous Minnesota murder victim.[3] According to Maloney's counsel, this statement was probative of Lahr's overall character for truthfulness. The district court declined to allow Maloney's counsel to question Lahr on this topic, agreeing with the Government that the line of questioning was "not helpful to the jury to understand her credibility," noting that the statement "sound[ed] like an exaggeration" and that Maloney's counsel would have ample opportunity to challenge Lahr's credibility without reference to this "far out," drug-induced comment.

Maloney's counsel questioned Lahr about her credibility during cross-examination without referencing the Wetterling murder, eliciting responses about Lahr's guilty plea to a conspiracy charge as a co-defendant of Maloney's; her plea agreement, which included the dismissal of two other charges; her cooperation with the Government and her desire to receive a reduced sentence based on her cooperation; her extensive drug use, including during the course of the conspiracy; and inconsistencies between her testimony and previous statements she made during interviews with the Government. Further, Maloney's counsel called a witness to specifically challenge Lahr's testimony and her character for truthfulness. The rebuttal witness testified that he had a long-standing friendship with Maloney; contradicted Lahr's testimony that she had known Maloney in high school; and opined that, through the several interactions he had had with Lahr, that she was "[n]ot at all" truthful.

---

[3]Jacob Wetterling was an 11-year-old boy who was kidnapped and murdered in 1989. His murder remained unsolved until 2016, and the case received significant media attention. See Rassier v. Sanner, 996 F.3d 832, 835 (8th Cir. 2021). After his kidnapping, Wetterling's parents successfully lobbied Congress to pass the Jacob Wetterling Act, which instituted a state sex-offender registry. People v. Cintron, 827 N.Y.S.2d 445, 448 (N.Y. Sup. Ct. 2006). At the time of Wetterling's disappearance and murder, Lahr was seven years old.

After the Government delivered its closing argument, Maloney's counsel alerted the district court for the first time that Maloney was requesting to represent himself and present his own closing argument. Maloney addressed the district court about his desire to represent himself, stating that he had "been made to keep all kinds of evidence that helps [him] out of this" and "that they've been keeping evidence from me that I needed to present for myself as evidence." Maloney further stated that he was "exercising [his] constitutional right to conduct [his] own business," stated that "[t]his is an ineffective sense [sic] of counsel," and accused the district court of "bully[ing him] to not get on the stand [and] bullying [him] now not to speak for [him]self." The district court informed Maloney that if he were allowed to make his closing argument, he would be restricted to commenting on the evidence that had been admitted and would not be allowed to discuss the other evidence he believed had been kept out. The district court also informed Maloney that if the jury were to listen to his closing argument "that's just an argument, and that's not evidence."

After engaging in more back-and-forth discussion with Maloney, where Maloney made a lengthy statement describing the Government as "hiding the ball" and "playing games with . . . evidence," and accusing the Government of malicious prosecution, the district court told Maloney that it was "too late for [him] to step up and do an argument at this point," also stating that it did not want to "go through the process of sorting out what [Maloney was] saying" and dealing with Government objections to his arguments. Finally, the district court stated that while it empathized with Maloney, it was not going to allow him to present closing argument because "it's much too late in the process and it would confuse the jury, and that's what I'm really concerned about. I don't want this jury to go out of this room to deliberate confused." Maloney's counsel proceeded to present the closing argument, and the case was submitted to the jury, which returned a guilty verdict.

Following the guilty verdict, Maloney filed a motion for judgment of acquittal or a new trial, asserting, as relevant here, that he was denied his Sixth Amendment right to self-representation. The district court denied the motion, noting that the right to self-representation is subject to the discretion of the district court once trial

commences, and reiterating that it had denied Maloney's request as both untimely and on the basis that it would substantially disrupt the proceedings. Ultimately, the district court sentenced Maloney to 262 months' imprisonment followed by 5 years of supervised release. Maloney now appeals.

## II.

Maloney first asserts that the district court erred when it limited his cross-examination of Lahr, resulting in a Confrontation Clause violation. "We ordinarily review 'evidentiary rulings regarding the scope of a cross examination for abuse of discretion, but where the Confrontation Clause is implicated, we consider the matter de novo.'" United States v. Arias, 936 F.3d 793, 798 (8th Cir. 2019) (citation omitted). "The Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' Although the Sixth Amendment guarantees a defendant an opportunity for effective cross-examination of witnesses, that right is not unfettered." United States v. Polk, 715 F.3d 238, 251 (8th Cir. 2013) (alterations in original) (citation omitted). Indeed, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." United States v. Jasso, 701 F.3d 314, 316 (8th Cir. 2012) (citation omitted). "To state a viable Confrontation Clause challenge to the district court's decision to limit cross-examination, the defendant must establish 'that a reasonable jury might have received a *significantly* different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination.'" United States v. Betts, 911 F.3d 523, 527 (8th Cir. 2018) (citation omitted). Therefore, "[w]e will not reverse a court's decision to limit cross examination 'unless there has been a clear abuse of discretion and a showing of prejudice to the defendant.'" Id. (citation omitted). In that vein, "Confrontation Clause violations are subject to harmless-error review." United States v. Jones, 728 F.3d 763, 766 (8th Cir. 2013). To determine "[w]hether an error is 'harmless beyond a reasonable doubt,'" we consider "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was

cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id. (citations omitted).

Maloney asserts that he should have been allowed to question Lahr about her history of making "outrageous and unsubstantiated claims"—including her claim to have been a witness to the Wetterling murder—and her drug- and trauma-induced mental illnesses because Lahr was the key Government witness, and this line of questioning was directly relevant to Lahr's credibility and her ability to truthfully recall and accurately describe events. We conclude that any error in limiting the cross examination of Lahr was harmless because Maloney has failed to demonstrate that the jury might have had a *significantly* different impression of Lahr had Maloney's counsel been able to question her about this history and that he was prejudiced by the district court's ruling.

While the district court did not allow Maloney to question Lahr about these specific claims, it gave Maloney significant opportunity to cross-examine Lahr and allowed Maloney to call a rebuttal witness to specifically challenge Lahr's testimony and character for truthfulness. The jury heard testimony from Lahr about her drug usage, her potential motives in cooperating with the Government, and the purported inconsistencies between her trial testimony and previous Government interviews, as well as testimony from a rebuttal witness who had spent time with Lahr and developed the opinion that she was not a truthful individual. Given that Maloney had the opportunity to challenge Lahr's credibility in other ways, specifically as it related to her character for truthfulness and her ability to accurately recall events, Maloney falls short of demonstrating that the proposed line of questioning might have caused the jury to form a significantly different view of Lahr's credibility. See Betts, 911 F.3d at 528 (finding no Confrontation Clause violation or clear abuse of discretion where district court limited cross-examination on topic of inconsistent statements because defendant was able to cross-examine witness about other inconsistences in prior statements); Polk, 715 F.3d at 251 (finding no Confrontation

Clause violation where district court limited cross-examination to exclude statement of "marginal relevance" with "potential prejudice," and defendant's counsel cross examined witness about other topic bearing on his truthfulness).

Further, Lahr's testimony was corroborated in many other ways, including through the introduction of the jail recordings themselves and testimony from other witnesses. Lahr testified about Maloney leading the drug distribution operation, the instructions he gave her, and explained or added context to the prison phone calls after the Government played them for the jury. This included explaining the code words Maloney and Lahr used to discuss drugs, with, for example, "onions" referring to ounces and "plant" or "elbow" referring to pounds. Lahr also explained nicknames that the parties used to refer to certain people.

In addition to the audio of the phone calls, the jury heard testimony from another Government witness, Special Agent Steve Mackenhausen, a law enforcement investigator, that he had listened to the phone calls and formed the impression that Maloney was facilitating illegal drug transactions from prison. He explained that his training and experience allowed him to conclude that the nature of the calls was consistent with drug sales, that coded conversation is almost exclusively used in illegal drug transactions, and that by listening to the hours of the phone calls and from knowledge from previous investigations he was able to understand the code to be referencing drug transactions. He further knew that some of the specific code words like "elbows" were being used to reference pounds. The Government also introduced the testimony of Special Agent Brandon Johnson, another investigator on the case, who testified that he had listened to the jail phone calls, was able to identify the individuals on the calls, and knew the nicknames mentioned during the calls. Agent Johnson testified about coded terms he became familiar with through his investigation and what he understood their meanings to be, such as the term "onions" being used to describe ounces and "elbows" being used to describe pounds. Thus, even if the district court erred in limiting Lahr's cross-examination, "any error was harmless." Jones, 728 F.3d at 767.

-10-

III.

Maloney next argues that the district court erred when it denied his request to represent himself during closing arguments. In Faretta v. California, the Supreme Court held that a criminal defendant has a constitutional right "to conduct his own defense" provided that he "clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel" and was "made aware of the dangers and disadvantages of self-representation." 422 U.S. 806, 835-36 (1975). However, the right to self-representation is not absolute. United States v. Prucha, 856 F.3d 1184, 1186 (8th Cir. 2017). Even where the defendant has "'ma[de] a clear and unequivocal request to represent himself, a court may nonetheless deny the request in certain circumstances,' such as when the request is untimely, the defendant 'engages in serious and obstructionist misconduct,' or the defendant is unable to produce a 'valid waiver' of right to counsel." Id. (citation omitted). "We review the district court's decision [to deny a request to proceed pro se] *de novo*." United States v. Kelley, 787 F.3d 915, 918 (8th Cir. 2015) (alteration in original). Further, "[t]he right to self-representation is unqualified only if demanded before trial." Prucha, 856 F.3d at 1187 (citation omitted). If a defendant makes a request for self-representation after trial has begun, his "right is subject to the trial court's discretion which requires a balancing of the defendant's legitimate interests in representing himself and the potential disruption and possible delay of proceedings already in progress." Id. (citation omitted).

Here, Maloney did not ask to represent himself until the last day of trial, and we conclude that the district court did not err in determining that this request was untimely. "We have routinely found requests made after the commencement of trial to be untimely," and here, Maloney's request came on the final day of a five-day trial, after the Government presented its closing argument. See id. As to Maloney's argument that the district court advised him at the pretrial conference that he would be able to represent himself during trial only to later tell Maloney it was "too late," this contention does not detract from our conclusion that the district court properly determined the motion was untimely. See id. ("That the district court advised

-11-

[defendant] he could make his motion to proceed pro se at any time does not make his motion timely. [Defendant] was allowed to make his motion, and the district court considered it. Only after the district court determined that the motion was untimely did the court deny the motion."). The district court was not bound by any earlier indication that Maloney would, at some point, be permitted to represent himself, particularly where, at the time the district court made this statement, Maloney had not made a motion to represent himself. See id.

Further, the district court properly balanced Maloney's interests in self-representation with the potential for delay or disruption of the ongoing proceedings. In discussing with the district court the reasons he wanted to present his own closing argument, Maloney repeatedly referenced evidence that had been excluded from trial, which he believed would exonerate him; accused the district court of bullying him by not allowing him to speak; and accused the Government of "playing games," "hiding the ball," and maliciously prosecuting him. Given this exchange, the district court determined that, on balance, the risk of the potential disruption to the proceedings—through what the district court reasonably assumed would be repeated objections by the Government during closing to the mention of topics the district court had prohibited Maloney from discussing—was greater than Maloney's interests in representing himself, specifically noting the risk that Maloney would discuss matters not in evidence and that his closing would confuse the jury. We find no error in this conclusion. See United States v. Wesley, 798 F.2d 1155, 1156 (8th Cir. 1986) (finding no error in district court's denial of mid-trial request for defendant to proceed pro se based on the disruption to the trial it would cause); United States v. Mathison, 1998 WL 405856, at *2 (8th Cir. July 14, 1998) (concluding that district court, which was concerned about jury confusion, acted within its discretion in denying request to proceed pro se for closing argument). We therefore conclude that the district court did not err in denying Maloney's request to represent himself at closing.

## IV.

Maloney also asserts that the district court erred when it denied his motion for discovery sanctions, arguing that the district court erred in finding that the Government did not violate any disclosure rule when there was a more than five-month delay in Maloney's ability to listen to the recorded prison phone calls, which formed a significant piece of the Government's case against him. "A district court has 'broad discretion with respect to discovery motions, and we will uphold the decision of the district court unless, considering all the circumstances, its rulings are seen to be a gross abuse of discretion resulting in fundamental unfairness at trial.'" United States v. Hoeffener, 950 F.3d 1037, 1043 (8th Cir. 2020) (citation omitted). Specifically, a "district court's decision not to exclude evidence under Rule 16 is reviewable for abuse of discretion. Subsidiary factual findings are reviewed for clear error." United States v. Spotted Elk, 548 F.3d 641, 660 (8th Cir. 2008) (citation omitted).

Under Federal Rule of Criminal Procedure 16(a)(1)(B), "[u]pon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing . . . any relevant written or recorded statement by the defendant . . . ." When "the discovery rules have been violated in a manner that prejudices the defendant's substantive rights," the offending "[e]vidence should be excluded." United States v. Valentine, 984 F.2d 906, 910 (8th Cir. 1993). The district court set the deadline for the Rule 16 disclosures as January 5, 2021, and, on that date, the Government made its disclosures. According to Maloney, however, the Government violated Rule 16 because the Government's disclosures provided Maloney with only the opportunity to inspect the audio recordings rather than copy them. And, even if inspection were enough, Maloney argues that the federal courthouse was effectively closed to the public due to the COVID-19 pandemic when the Government purportedly made the records available for inspection. We are unpersuaded by each of Maloney's arguments.

First, Maloney ignores that the Government provided him with copies of the phone recordings for his use in preparing for trial, and did so before the January 5, 2021 Rule 16 deadline imposed by the district court. While there were undisputedly significant technical issues with listening to the recordings, this does not contradict the fact that, by the disclosure deadline, the Government had produced the recordings. Further, no evidence suggests that the technical issues were intentional; rather, they were "inherent in the nature and volume of the digital evidence in this case." Indeed, after the Government was first notified of the defense's inability to listen to the recordings on March 31, 2021, the Government communicated with the defense, attempting to resolve the technical issues. Maloney concedes that the Government responded to each of his counsel's communications and made attempts to resolve the technical issues, and we note that the technical issues were ultimately resolved, allowing both Maloney and his counsel to listen to the recordings 10 months before trial.

Second, the Government provided ample opportunity for Maloney's counsel to inspect the discovery materials in the Government's possession before trial. In its disclosures, the Government identified the recordings and stated that it would make them all available at a mutually agreeable time and place. The record does not reflect that the defense requested that other arrangements be made. Thus, any argument from Maloney about whether his attorneys would have been able to enter the federal courthouse is immaterial. On these facts, the district court did not abuse its discretion in finding no discovery violations because the Government complied with the dictates of Rule 16, even considering delays in Maloney being able to listen to the jail recordings. We thus affirm the district court's denial of the motion for discovery sanctions.

V.

Finally, Maloney asserts that his Sixth Amendment speedy trial rights were violated because he was not tried until 17 months after he was indicted. According to Maloney, he was prejudiced by the delay because he was incarcerated prior to

trial, which he found "particularly oppressive and anxiety-inducing," and because the delay allowed the Government's star witness to recover from her methamphetamine addiction, allowing her to appear as a much more credible witness than if she had testified while still suffering from the physical effects of her addiction. Maloney raises a constitutional speedy trial claim, which, in contrast to a Speedy Trial Act claim, may be reviewed for plain error where it was not raised before the district court. United States v. Gearhart, 576 F.3d 459, 462-63 (7th Cir. 2009); cf United States v. Elmardoudi, 501 F.3d 935, 944 (8th Cir. 2007) (reviewing for plain error defendant's argument concerning district court's choice of remedy after finding a constitutional speedy trial violation when the defendant did not raise argument before district court). Because Maloney did not raise his Sixth Amendment speedy trial claim before the district court, we review for plain error only, which requires Maloney to "show (1) an error, (2) that is plain, and (3) that affects his substantial rights." United States v. Gant, 973 F.3d 840, 842 (8th Cir. 2020) (per curiam). Further, "[w]e will exercise our discretion to correct such an error only if it 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" Id. (citation omitted).

In Barker v. Wingo, 407 U.S. 514 (1972), "[t]he Supreme Court identified four factors to consider when applying a Sixth Amendment balancing test to a pretrial delay: the length of delay, the reason for delay, whether the defendant asserted the right to a speedy trial, and whether the defendant suffered any prejudice." United States v. Perez-Perez, 337 F.3d 990, 995 (8th Cir. 2003). In considering the length of delay, we conduct a "double inquiry," first considering "whether the length of delay was presumptively prejudicial such that it triggers the Barker analysis," and second, "if triggered, . . . the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." United States v. Johnson, 990 F.3d 661, 670 (8th Cir. 2021) (citation omitted). "As to the latter inquiry, 'the presumption that pretrial delay has prejudiced the accused intensifies over time.'" United States v. Rodriguez-Valencia, 753 F.3d 801, 805 (8th Cir. 2014) (citations omitted). Here, the Government acknowledges that the length of the delay—17 months—is presumptively prejudicial. See United States v.

Shepard, 462 F.3d 847, 864 (8th Cir. 2006) (holding that a 17-month delay between arraignment and trial "compel[led the Court] to look to the other factors in the balancing test"). Because the length of the delay is presumptively prejudicial, we turn to the other Barker factors—the reasons for the delay, the assertion of the right, and prejudice.

Next, considering the reason for the delay, this factor weighs against Maloney. While Maloney's inability to listen to the audio recordings of the prison phone calls may have contributed to the delay, numerous other events also played a part, including that Maloney twice changed counsel and that the parties filed numerous pretrial motions. Moreover, for a period of six months, no criminal trials occurred in the District of Minnesota due to the COVID-19 pandemic. Simply stated, "there is no evidence that the Government intentionally caused any delay or filed pretrial motions to cause delay in order to gain a tactical advantage." Id.

Considering the third factor, Maloney's assertion of the right, this factor again weighs in favor of the Government. Maloney did not make a clear and unequivocal assertion of his right; instead, he asserted in his memorandum in support of his motion for discovery sanctions that the delay caused by the inability to listen to the audio files "violate[d] Maloney's right to a speedy trial." While Maloney made this claim, he did not seek any relief related to it, focusing solely on discovery sanctions. See Johnson, 990 F.3d at 671 (concluding factor weighed against defendant when she "only weakly asserted her speedy trial right"). And, while Maloney asserted that he wanted his case to be brought to trial sooner, on three separate occasions, he moved for additional continuances. See Shepard, 462 F.3d at 864 (concluding third factor weighed against defendant when defendant "made no attempt to have his case brought to trial sooner").

Finally, the fourth factor, prejudice, also weighs against Maloney. "[W]e assess the prejudice to the defendant in light of the following three interests: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'"

-16-

Johnson, 990 F.3d at 671 (citation omitted). In considering the second interest, we note that a defendant's desire to avoid "[a]nxiety, without concurrent prejudice to the defendant's ability to mount a defense, is likely the weakest interest served [by the Sixth Amendment]." Id. (alterations in original) (citation omitted). Maloney's complaints that his period of pre-trial detention caused him to miss employment and treatment opportunities as well as the birth of his son do not demonstrate prejudice. See Shephard 462 F.3d at 865 (finding no prejudice where defendant claimed he suffered from anxiety and was unable to see his children during pre-trial detention); Morris v. Wyrick, 516 F.2d 1387, 1391 (8th Cir. 1975) ("Anxiety and concern of the accused are undoubtedly present to some degree in every case. However, that alone does not establish prejudice where . . . the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific instances." (citation omitted)). Maloney's claim that the delay rendered him unable to cross-examine Lahr when she most visibly appeared to be a drug user is based on nothing more than speculation, and, given the significant corroborating evidence the jury heard, it is unlikely that Lahr's appearance alone would have significantly altered the jury's view of her credibility, and thus the outcome of the case. Because only one of the four factors weighs in Maloney's favor, we find no error, much less one that is plain, with respect to the denial of Maloney's constitutional speedy trial claim.

VI.

For the foregoing reasons, we affirm the judgment of the district court. Maloney's motion for leave to file a supplemental brief and for appointment of new counsel is denied. Maloney's petition for a writ of mandamus is also denied.

_____