# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 13-2043

———————————————

United States of America

*Plaintiff - Appellee*

v.

Porfirio Ortega

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

——————————

Submitted: January 16, 2014
Filed: May 9, 2014

——————————

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

——————————

MURPHY, Circuit Judge.

Porfirio Ortega was convicted by a jury of conspiring to possess with intent to distribute cocaine in violation of 21 U.S.C. § 841(b)(1)(A)(ii) and 21 U.S.C. § 846. The jury found that Ortega conspired to distribute five kilograms or more of cocaine,

an amount which Ortega now disputes.  Ortega also appeals the district court's[1] admission of 7.2 kilograms of cocaine seized from Ortega's coconspirators.  We affirm.

I.

The Drug Enforcement Administration's (DEA) investigation of Porfirio Ortega began in 2010 in conjunction with the investigation of Gabriel Garcia Madrigal, a/k/a "Chinto."  The DEA learned that Chinto was distributing narcotics and enlisted the aid of informant George Tutuianu.  On November 2, 2010, Tutuianu sought to purchase marijuana from Chinto, who directed Tutuianu to the house of his associate Porfirio Ortega.  Tutuianu was unable to obtain marijuana from Ortega, but successfully purchased an ounce of cocaine.  In the audio recording of this transaction, Ortega stated that the ounce was a portion of a "kilo and a half" of cocaine he possessed.

One week later Tutuianu called Chinto and inquired about purchasing more cocaine from Ortega.  Chinto then called Ortega who responded he was not in town, but that he would call one of his nephews and tell Chinto where to go to make a purchase.  The next day Ortega instructed Chinto to go to his garage where his nephew would sell him cocaine.  While in the garage, Chinto and Tutuianu met with Felix Rodriguez-Arreola, a/k/a "El Don," who informed them that he was Ortega's drug supplier.  Tutuianu bought two ounces of cocaine from El Don in exchange for $1,600 that had been given him by the DEA.

Tutuianu and Chinto again went to Ortega's house to purchase cocaine on November 23.  While there, Chinto and Ortega had a conversation recorded by the

---

[1]The Honorable Catherine D. Perry, Chief United States District Judge for the Eastern District of Missouri.

wire Tutuianu wore, in which Ortega told Chinto that "they" were going to bring him a kilogram of cocaine and that he could sell a kilogram of cocaine that was seventy percent pure. Tutuianu purchased another ounce of cocaine from Ortega at this meeting. Then on December 13, Tutuianu drove Ortega to a trailer park. There, Ortega provided Tutuianu with three ounces of cocaine.

Tutuianu made three more purchases of cocaine from Ortega: five ounces on December 14, two ounces on December 20, and four ounces on January 4, 2011. On January 12 Tutuianu brought an undercover officer to Ortega's house who purchased three ounces of cocaine from him. The DEA then began to monitor Ortega's cell phone calls on January 31. In February 2011, the DEA provided Tutuianu with a cocaine press, which Tutuianu in turn gave to Ortega. Ortega and two others picked the press up from Tutuianu's home and took it to Ortega's garage.

In a conversation between Ortega and Tutuianu recorded on February 15, Ortega stated that he had fourteen ounces of cocaine left and that he had made trips to Chicago and Texas to acquire cocaine. Ortega and Tutuianu also talked about the expected arrival of Ortega's supplier El Don, who was coming over to Ortega's house that evening. They calculated that Ortega could sell Tutuianu a kilogram of cocaine for $23,000 if he paid up front and $27,000 if he paid after receiving the drugs. On February 20, Tutuianu met with Ortega and El Don at Ortega's home. Ortega produced a mold for the cocaine press to press cocaine into kilogram sized bricks, and the three pressed two bricks of cocaine. El Don stated that while he had five kilograms, he had only brought two over to Ortega's house.

In a February 28 intercepted phone call between Ortega and a nephew, Ortega instructed his nephew to meet with Misael Lopez-Rico in order to obtain cocaine from him to sell to David Morales. Ortega explained that he had to call El Don to authorize Lopez-Rico to give the nephew the cocaine. They then discussed the price and how much they would make from the deal. Investigators observed Lopez-Rico

and Morales enter Ortega's home; officers stopped Morales while he was driving home but were unable to locate the cocaine. After the stop Morales called Ortega and reached another of his nephews to report that the police had stopped the car but were unsuccessful in finding the cocaine.

Less than one month later on March 25, 2011, investigators learned that Ortega's associate, El Don, had arranged to have cocaine delivered by Misael Lopez-Rico from Kansas City to St. Louis. Agents stopped Lopez-Rico's car, and hidden inside a secret compartment they found four bricks of cocaine wrapped in clear plastic packaging and seven bricks of cocaine wrapped in blue paper packaging. Following this incident, the DEA obtained a warrant to monitor El Don's calls.

The government sent the substances seized from Lopez-Rico's car to a laboratory for identification, where they were tested by chemist Kristen Beer. Beer created two composite samples–one with the substances in the clear plastic packaging and the other with substances from blue paper packaging. Prior to trial Beer was called into active duty military service in Afghanistan, making her unavailable to testify. The government had another forensic chemist, Peter Ausili, retest the composite samples. Ausili identified the substances to be cocaine which weighed approximately 7.2 kilograms in total.

On April 17, the DEA intercepted two telephone calls between Ortega and El Don. In the first conversation El Don asked about whether a buyer needed "costly chickens." A DEA agent testified at trial that in this operation "chickens" was used as a codeword for cocaine. Ortega told El Don that the buyer "is every third day . . . once or twice a week." El Don replied that Ortega should call the buyer and see how much he needed, and then El Don could leave that amount with Ortega's wife for him to deliver. Ortega agreed to call the buyer.

In a second conversation that day, Ortega told El Don that he had "a better situation." At the time of this call Ortega was in a room with drug suppliers, and he asked if El Don wanted to buy a "house" from them. The two discussed quantity and price, and settled on El Don receiving "five" at a price of $26,000 or $26,500. The DEA witness testified that the going price for a kilo of cocaine at the time of that conversation had been $27,000. Ortega offered to put the suppliers on the phone, but El Don instead said "No! Just tell them." Finally Ortega asked "what about me?" and "[a]re you going to help me?" El Don responded that he would help Ortega, but the record does not reveal whether he ever did.

At Ortega's trial, DEA analyst Peter Ausili testified to his analysis of the 7.2 kilograms of cocaine seized from Lopez-Rico's car. Ortega objected to the admission of the substances on the grounds that Ausili tested the composite samples and not each bag individually. The district court overruled the objection and admitted the exhibits containing the substances. The jury found Ortega guilty of conspiracy to distribute five kilograms or more of cocaine. After the verdict Ortega moved for a judgment of acquittal, claiming that the evidence was insufficient to find he had been involved with five kilograms or more of cocaine. Ortega acknowledged that the DEA had obtained 605 grams of cocaine from sales which Ortega made or assisted in making but disputed that he was responsible for more. The district court denied the motion for acquittal, and Ortega now appeals.

II.

Ortega first challenges the sufficiency of the evidence, contending that no rational jury could have found he had participated in a conspiracy involving five kilograms or more of cocaine. We review the sufficiency of the evidence in the "light most favorable to the verdict" and reverse a conviction "only if no reasonable jury could find that the elements of the offense have been proven beyond a reasonable doubt." United States v. Booker, 576 F.3d 506, 512 (8th Cir. 2009). The elements

of conspiring to distribute drugs under 21 U.S.C. § 846 are (1) the existence of a conspiracy, "i.e., an agreement to distribute the drugs," 2) the defendant's knowledge of the conspiracy, and 3) the defendant's intentional joining of the conspiracy. United States v. Polk, 715 F.3d 238, 246 (8th Cir. 2013) (internal quotation marks omitted).

A defendant is liable for the reasonably foreseeable actions taken by coconspirators in furtherance of the conspiracy "unless he affirmatively withdraws from the conspiracy." United States v. Marquez, 605 F.3d 604, 611 (8th Cir. 2010). To establish withdrawal from a conspiracy, the defendant has the burden to demonstrate that he took affirmative action by "making a clean breast to the authorities or by communicating his withdrawal in a manner reasonably calculated to reach his coconspirators." United States v. Jackson, 345 F.3d 638, 648 (8th Cir. 2003) (internal quotation marks omitted). A showing of nothing more than that the defendant has ceased activities "is not sufficient to establish a withdrawal from the conspiracy." Id.

Moreover, the "souring of a relationship between a defendant and his coconspirators resulting in an end of the defendant's business relationship with the conspiracy is insufficient to establish a withdrawal from the conspiracy." United States v. Rodriguez-Ramos, 663 F.3d 356, 363 (8th Cir. 2011). In Rodriguez-Ramos, the defendant challenged the sufficiency of the evidence that he had conspired to distribute more than 50 grams of methamphetamine. Id. The defendant's coconspirator there had delivered 13 kilograms of methamphetamine after the two had had a dispute. We determined that the defendant had neither informed the police nor his coconspirator that he had withdrawn. Id. at 363–64. In fact the defendant had pursued further dealings with his coconspirator after that delivery and thus was responsible for the 13 kilograms which had been involved in the conspiracy of which he "was a member and from which he had not withdrawn." Id. at 364.

Ortega acknowledges that he was responsible for approximately 605 grams of cocaine which DEA agents obtained from sales which Ortega made or assisted in making, and that Ortega and El Don formed an agreement "early on" to distribute cocaine. He contends, however, that he withdrew from this conspiracy following his February 28, 2011 sale of drugs to David Morales. Ortega claims that the evidence was insufficient to show his involvement with five or more kilograms of cocaine, arguing that he had withdrawn before El Don organized the delivery of the intercepted 7.2 kilograms of cocaine on March 25, 2011.

Ortega argues that the sole evidence of a conspiracy existing at the time of the seizure of 7.2 kilograms of cocaine on March 25, 2011 was the April 17, 2011 phone calls between Ortega and El Don. In that call Ortega had arranged for El Don to buy five kilograms of cocaine. Ortega's argument is unavailing. A conspiracy between Ortega and El Don having been established by the government, the burden rested with Ortega to prove that he affirmatively withdrew from it, not with the government to prove the nonexistence of withdrawal. See Smith v. United States, 133 S. Ct. 714, 720 (2013) (holding that in passing 21 U.S.C. § 846, Congress left the common law burden of proving the affirmative defense of withdrawal on the defendant rather than requiring the government to prove nonexistence of withdrawal).

We conclude that Ortega has not met his burden of establishing that he withdrew from the conspiracy he had entered with El Don. The evidence he cites, such as the fact that El Don told Tutuianu that he suspected Ortega might be working with law enforcement and instructed Tutuianu to deal directly with El Don rather than Ortega, is insufficient to prove that Ortega withdrew from the conspiracy. See Rodriguez-Ramos, 663 F.3d at 363. Like the defendant in Rodriguez-Ramos, Ortega continued the illegal relationship with his coconspirator following the date of his alleged withdrawal, as shown by his attempt to arrange for El Don to purchase five kilograms of cocaine. Ortega did not come forward to the authorities, nor is there evidence that he informed his coconspirator El Don of his withdrawal from their

-7-

conspiracy. See Jackson, 345 F.3d at 648. He is therefore liable for his coconspirator El Don's reasonably foreseeable act of having Lopez-Rico deliver 7.2 kilograms of cocaine in furtherance of the conspiracy. See Rodriguez-Ramos, 663 F.3d at 364.

III.

Ortega objects to the admission of three of the government's exhibits: the first contained a composite sample and the substance which had been found wrapped in four clear plastic packages seized from Lopez-Rico's car, the second contained a composite sample and the substance which had been found wrapped in seven blue paper packages seized from Lopez-Rico's car, and the third contained the clear plastic and blue paper wrappings. He contends that the admission of these exhibits violated the Confrontation Clause of the Sixth Amendment because the testifying chemist, Peter Ausili, tested composite samples which another chemist, Kristen Beer, had produced from the substances seized in Lopez-Rico's car.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has clarified that this amendment "applies to witnesses against the accused—in other words, those who bear testimony." Crawford v. Washington, 541 U.S. 36, 51 (2004) (internal quotation marks omitted). Thus, under the Confrontation Clause testimonial statements are inadmissible unless the testifying witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity to cross examine him. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009).

Ortega objected at trial to the admission of the physical substances seized from Lopez-Rico's car; he did not object to the admission of any out of court statement by a witness. To the extent that Ortega now argues that Ausili's testimony that Beer created the composite sample was an out of court statement inadmissible under the

Confrontation Clause, our review is for plain error. See United States v. Tenerelli, 614 F.3d 764, 772 (8th Cir. 2010). Ortega made no Confrontation Clause objection to this statement at trial. Our first inquiry is therefore whether the district court plainly erred by not sua sponte excluding Ausili's testimony that Beer created the composite sample from the substances seized from Lopez-Rico's car.

Ortega now seeks to attack the foundation for admission of the cocaine by pointing to a gap in the chain of custody to question the authenticity of the sample. While Ausili's statement regarding Beer's creation of the composite sample was relevant to the chain of custody, we have acknowledged that "chain of custody alone does not implicate the Confrontation Clause." United States v. Johnson, 688 F.3d 494, 505 (8th Cir. 2012) (concluding that statement that lab assistant had checked samples in and out of the lab is not a testimonial statement offered to prove the truth of the matter asserted). The Supreme Court has explained that "it is not the case[] that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." Melendez-Diaz, 557 U.S. at 311 n.1. Rather, "[i]t is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony is introduced must (if the defendant objects) be introduced live," and "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." Id. (alteration in original) (internal quotation marks omitted). Here, in the absence of an objection to admission of Beer's out of court statement, we conclude that it was not plain error for the district court to admit Ausili's testimony regarding the chain of custody for the composite samples.

Ortega has no other viable Confrontation Clause basis for excluding evidence. He claims that this case is similar to Melendez-Diaz, in which the government sought to introduce certificates of analysis that contained the results of forensic analysis rather than producing the analysts themselves to testify, 557 U.S. at 308–09, and Bullcoming v. New Mexico, 131 S. Ct. 2705, 2710 (2011), in which the government

sought to introduce a forensic report through the in court testimony of a scientist who had not performed or observed the testing described in the report. The posture of Ortega's case is significantly different from Melendez-Diaz and Bullcoming. In this case the government had Peter Ausili test the substances found in Lopez-Rico's car and he found them to be cocaine. Ausili also testified to the results of his analysis at trial, where Ortega took the opportunity to cross examine him. The admission of Ausili's testimony and report are therefore not barred by the Confrontation Clause. See Melendez-Diaz, 557 U.S. at 309. This was in stark contrast to both Melendez-Diaz and Bullcoming, where the witnesses who had identified the substances were not present at trial.

The original report by testing analyst Beer was not offered by the government as evidence, nor did the government question Ausili regarding the results of Beer's initial test. Instead, after Beer was called into active duty in Afghanistan, the government had Ausili personally retest the substances and testify as to the results of the test he performed. The Supreme Court has observed that this procedure complies with the Confrontation Clause. See Bullcoming, 131 S. Ct. at 2718 (noting that the government "could have avoided any Confrontation Clause problem by asking [the analyst who appeared in person at trial] to retest the sample, and then testify to the results of his retest rather than to the results of a test he did not conduct or observe.").

Ortega had the opportunity to cross examine Ausili on the issue of whether or not the samples he tested in fact came from the eleven packages seized from Lopez-Rico's car. Such a challenge goes to the authenticity of the sample and the chain of custody, and as the Court acknowledged in Melendez-Diaz such questions bear on the weight of the evidence. 557 U.S. at 311 n.1. The jury was free to decide whether the substances admitted were part of the conspiracy Ortega was involved in or whether they were in fact cocaine. And the jury in fact found that Ortega was responsible for a conspiracy to distribute five kilograms or more of cocaine.

Finally, Ortega has put forward no other meritorious basis for his objection to the admission of these exhibits. We review a district court's ruling on the admissibility of evidence for abuse of discretion. United States v. Robinson, 617 F.3d 984, 990 (8th Cir. 2010). Evidence is admissible where there is "a reasonable probability it has not been changed or altered," Johnson, 688 F.3d at 505, and we employ a "presumption of integrity of physical evidence absent a showing of bad faith, ill will, or tampering with the evidence," id. Ortega's objection to admission of the exhibits was based on the fact that Ausili did not personally test each package of cocaine, but instead tested the composite samples. Ortega has made no showing of bad faith or evidence tampering, and we therefore presume the integrity of the samples had been undisturbed. See id. The district court did not abuse its discretion in admitting the exhibits.

## IV.

Ortega joined a conspiracy that distributed over five kilograms of cocaine and from which he never withdrew. The district court properly denied Ortega's motion for acquittal and properly admitted the 7.2 kilograms of cocaine which the DEA seized as part of its investigation into the conspiracy. Ortega's Confrontation Clause challenge to the admission of this physical evidence fails because the analyst who tested and identified the substance as cocaine testified at trial, where Ortega had an opportunity to cross examine him.

We affirm the judgment of the district court.

_____