# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-1327

_____

United States of America,

*Plaintiff - Appellee,*

v.

Sienemah Terrance Gaye,

*Defendant - Appellant.*

_____

No. 17-1347

_____

United States of America,

*Plaintiff - Appellee,*

v.

Finoh Sahr Fillie,

*Defendant - Appellant.*

_____

No. 17-1496

_____

United States of America,

*Plaintiff - Appellee,*

v.

Prince Korboi Sumoso,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: February 15, 2018
Filed: August 29, 2018

_____

Before SMITH, Chief Judge, MURPHY[*] and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Sienemah Gaye, Finoh Fillie, and Prince Sumoso, along with twenty-two other co-defendants, were indicted for their involvement in a scheme to defraud banks. Gaye pleaded guilty to conspiracy to commit bank fraud, *see* 18 U.S.C. §§ 1344 and 1349, twenty counts of aiding and abetting bank fraud, *see* 18 U.S.C. § 1344, and two counts of aiding and abetting aggravated identity theft, *see* 18 U.S.C. § 1028A. Fillie pleaded guilty to conspiracy to commit bank fraud and one count of aiding and abetting aggravated identity theft. Sumoso pleaded guilty to conspiracy to commit bank fraud and four counts of aiding and abetting bank fraud. The district court[1]

_____

[*]This opinion is filed by Chief Judge Smith and Judge Colloton under Eighth Circuit Rule 47E.

[1]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

sentenced Gaye, Fillie, and Sumoso to 144, 134, and 54 months' imprisonment, respectively, and ordered each to pay restitution. The three defendants appeal, alleging that the district court erred in determining their sentences. For the reasons explained below, we affirm.

I.

The conspiracy in this case involved a scheme to defraud financial institutions in the Minneapolis-St. Paul metro area by cashing counterfeit checks drawn on accounts of businesses and individuals. Participants in the scheme played several roles. "Manufacturers" created the counterfeit checks using check-printing software and blank check stock. "Bank insiders" provided bank account information for use on counterfeit checks. "Managers" and "recruiters" enlisted individuals who would serve as payees on the checks. These individuals, called "runners," took the checks to the bank to cash or deposit.

Members of the conspiracy acquired payor account information through various means. Using social media, participants searched the hashtag "#myfirstpaycheck" and found photographs of legitimate paychecks that unwitting victims had posted online. Bank insiders sometimes provided account information. Some conspirators willingly turned over their own payroll or personal checks to be counterfeited by other members of the conspiracy.

Gaye was involved in this scheme from June 2005 to September 2013. Sumoso and Fillie joined later, with Sumoso participating from August 2007 to September 2013, and Fillie participating from November 2007 until September 2013. During the period between November 2007 and September 2013 alone, more than 500 runners negotiated over 1500 counterfeit or fraudulent checks. Gaye and Fillie printed checks and passed them to the runners who took the checks to a bank to cash or deposit. The two also opened bank accounts and negotiated counterfeit checks in the names of

-3-

individuals whose identities had been stolen. Sumoso served primarily as a recruiter; he provided runner information to manufacturers and transported runners to banks to deposit the fraudulent checks.

Gaye, Fillie, and Sumoso pleaded guilty to the charges against them, and the district court held a consolidated evidentiary hearing to resolve disputed sentencing issues. The court made findings under the sentencing guidelines that increased the offense levels for each defendant. On appeal, Gaye, Fillie, and Sumoso each challenge their sentences, arguing primarily that the district court committed procedural error in applying the guidelines. We review the district court's findings of fact for clear error and its application of the guidelines *de novo*.

## II.

## A.

## 1.

Gaye raises seven claims of error. He first complains that the district court improperly considered a report of Gaye's proffer interview with the government. The report included self-incriminating statements about Gaye's involvement in the bank fraud scheme. Gaye argues that the district court relied on the statements in upholding the government's refusal to move for a one-level reduction for acceptance of responsibility under USSG § 3E1.1(b). He contends that the court's use of the information was contrary to USSG § 1B1.8(a) and the proffer agreement.

USSG § 1B1.8(a) addresses the use of information provided by a defendant who agrees to cooperate with investigators. Where the government agrees that self-incriminating information provided under an agreement will not be used against the defendant, § 1B1.8(a) provides that the district court must not use the information to

-4-

determine the applicable guideline range, "except to the extent provided in the agreement."

Before pleading guilty, Gaye agreed to meet with the government to provide information concerning the bank fraud conspiracy. As part of that arrangement, the parties signed an agreement that set forth the terms and conditions of the proffer interview. Among other things, the government agreed that it "w[ould] not offer in evidence . . . in connection with any sentencing proceeding for the purpose of determining an appropriate sentence, any statements made by [Gaye] at the meeting," subject to certain enumerated exceptions. Under one exception, the parties agreed that "the government may use . . . statements made by [Gaye] at the meeting . . . *to rebut any evidence, argument or representations offered by or on behalf of [Gaye] . . . at sentencing*." (emphasis added).

Whether the district court properly considered Gaye's proffer interview at sentencing turns on whether the quoted exception allowed for the use of the information. The district court concluded that "based on the facts and the language of the proffer agreement," Gaye's statements during the interview could be used "for the limited purpose of rebutting Mr. Gaye's denial of many of the facts in the [presentence investigation report]." We agree.

During the proffer interview, Gaye explained that he printed and signed checks for other members of the conspiracy, and said that he "received $200-$300 per check for each person he recruited." He admitted that he and his co-conspirators "had meetings" at various locations during which they "would discuss issues regarding the cuts of checks not being paid or people running off with the money." Gaye also told the government that he and a co-conspirator opened a bank account in the name of Richard Wyss.

But in his objections to the presentence investigation report (PSR) prepared by the probation office, Gaye denied many of these facts. He objected to and denied statements that he "created counterfeit checks," "provided counterfeit checks," and "shared in the fraudulent proceeds of the scheme." Gaye objected to the statement that "members of the conspiracy met at various locations to distribute checks and proceeds of the fraud and also to discuss logistics of the scheme, disputes among the coconspirators and related topics." He added a denial: "Defendant denies the meetings occurred and that he was an attendee of the meetings." Gaye also denied that he "opened a fraudulent Bank of America account using the real name, date of birth, and social security number of victim R.D.W., a real person whose identity had been stolen, but with Gaye's address and phone number." Gaye stood by his objections at the sentencing hearing, even though he had pleaded guilty to aggravated identity theft involving victim R.D.W., and even though the government presented additional testimony during the hearing to substantiate other factual allegations in the PSR.

Gaye contends that his objections to the PSR were not "evidence, argument or representations," so the court was not permitted to consider his proffer interview under the exception stated in the agreement. But Gaye did more than object to the facts listed in the PSR and put the government to its burden of proof. By affirmatively denying certain facts, Gaye asserted that those facts were not true. This amounted to making "representations" about those facts.

Gaye also argues that his "statements were entirely consistent with the confidential information he shared with the Government," but we disagree. Gaye's denials directly contradicted some of the information he provided to the government before sentencing, and therefore triggered the exception in the proffer agreement. The agreement thus permitted the district court to consider Gaye's statements "for the purpose of determining an appropriate sentence." *See United States v. Loesel*, 728

F.3d 749, 753-54 (8th Cir. 2013); *see also United States v. Araujo*, 622 F.3d 854, 860-62 (7th Cir. 2010).

2.

Gaye contends that the court erred by increasing his offense level under USSG § 3C1.1 for obstruction of justice. Section 3C1.1 provides for a two-level increase if the defendant "willfully obstructed or . . . attempted to obstruct . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," so long as "the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." Obstructive conduct includes, among other things, "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so," as well as "other conduct prohibited by obstruction of justice provisions under Title 18, United States Code." USSG § 3C1.1, comment. (n.4(A), (I)).

The district court found that Gaye had attempted to discourage a witness, Jeffrey Gbor, from testifying at his trial. The court cited a series of text messages that Gaye exchanged with Gbor's girlfriend, Kiana Harris, and other communications between Harris, Gbor, Gbor's friend, and Gbor's brother.

Before pleading guilty, Gaye learned through discovery that the government was planning to call Gbor as a witness against him. Gaye sent a text message to Harris on May 1, telling her that Gbor was going to testify against him. Harris responded with disbelief and said, "Does soda know?? . . . Maybe he can talk to him n tell him to chill." ("Soda" is a nickname for Gbor's friend Marcel Chambers.) Gaye stated that he had not talked to Soda yet, and Harris replied, "U want me to tell soda?? I know they talk." Gaye responded, "Yea." A few minutes later, Harris sent a text message to Soda, referring to Gaye by his nickname "Nema." The message stated: "Nema just hit me n told me he's in his lawyers office and just found out that

Jeffery is going to testify against him. . . . Can u please talk to him n tell him to fall back on that."

Soda responded about fifteen minutes later, expressing disbelief but telling Harris that he would "see wussup tho." Harris forwarded Soda's message to Gaye, and in response, Gaye sent Harris pictures that he took of documents showing Gbor's cooperation with the government. Harris forwarded one of these photos to Soda, reiterating that Gbor was testifying against Gaye, and saying "U better try n talk to him ASAP." In another message, Harris told Soda, "Hopefully he recants his statement." Soda said, "Right . . . maybe he won't testify if I say something."

Three days later, on May 4, Gbor told the government that he no longer wished to cooperate. Soda sent Harris a message telling her that Gbor was not going to testify against Gaye. Harris reported back to Gaye that "[S]oda said he talked to snitch bitch and he said he wasn't going to testify if they called him to the stand." In a later message, she said, "Anyway, hopefully that helps."

Gaye contends that under a "neutral reading," his messages to Harris do not constitute obstruction, because they do not "suggest [Gaye] sought to intimidate Gbor to recant his cooperation." But the guideline does not require a finding of intimidation. Obstructive conduct under § 3C1.1 also encompasses "unlawfully influencing" a witness or attempting to do so, and any "other conduct prohibited by obstruction of justice provisions under Title 18, United States Code." *Id.*, comment. (n.4(A), (I)).

The district court found that Gaye attempted to "discourage a witness from testifying." R. Doc. 1341, at 44. The federal witness tampering statute, 18 U.S.C. § 1512(b)(1), makes it a crime to "knowingly . . . corruptly persuade[] another person, or attempt[] to do so, . . . with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding." A defendant may be found to engage

-8-

knowingly in corrupt persuasion where he acts with "consciousness of wrongdoing." *United States v. Mann*, 701 F.3d 274, 305-06 (8th Cir. 2012). The district court did not clearly err in finding that Gaye's conduct met that standard.

Gaye's messages with Harris make clear that Gaye knew that Gbor had provided evidence that incriminated Gaye. Gaye's agreement with Harris to have Soda tell Gbor to "chill," followed by his transmission of documents to Harris confirming that Gaye was a cooperating witness, demonstrates that Gaye knew that he was attempting to influence, delay, or prevent the testimony of Gbor in an official proceeding against Gaye. The evidence supported a finding that Gaye did so with consciousness of wrongdoing. Even assuming that innocent attempts to encourage a person to exercise his right against self-incrimination do not violate the statute, *see United States v. Farrell*, 126 F.3d 484, 488 (3d Cir. 1997), the record supports a finding that Gaye did more. Gbor already had pleaded guilty, waived his right against self-incrimination, and disclosed incriminating information about Gaye to the government. Gaye then attempted to stop Gbor from testifying. It was thus not clearly erroneous to find that Gaye's messages constituted obstruction of justice that warranted a two-level increase under the guidelines. *See United States v. Hemsher*, 893 F.3d 525, 535 (8th Cir. 2018).

3.

Gaye next complains that the district court erred by not awarding him a third-level reduction under the guideline for acceptance of responsibility. *See* USSG § 3E1.1. He received a two-level reduction for accepting responsibility. The guidelines permit a sentencing court to decrease by one additional level, "upon motion of the government," if the defendant's guilty plea allowed the government and court to allocate resources efficiently. USSG § 3E1.1(b); *see also id.*, comment. (n.6). The government did not move for a third-level reduction, and a district court "may not order the government to file the motion unless the government's refusal was

based on unconstitutional motive." *United States v. Jordan*, 877 F.3d 391, 394 (8th Cir. 2017).

Gaye asserts that the government lacked any basis to withhold the motion. Insofar as he means that the government acted irrationally, and thus unconstitutionally, the record does not support the contention. The government argued at sentencing that Gaye was not entitled to any reduction at all, because he had frivolously denied facts in the presentence report and obstructed justice. These were legitimate bases for opposing any reduction for acceptance of responsibility, *see* USSG § 3E1.1, comment. (nn.3-4), and the district court's generous award of a two-level reduction did not compel the government to move for a third. The district court committed no clear error in declining to award Gaye a three-level reduction for acceptance of responsibility.

4.

Gaye also challenges the district court's calculation of loss amount. The guidelines provide for a fourteen-level increase if loss from the defendant's offense is greater than $550,000 but less than or equal to $1,500,000. USSG § 2B1.1(b)(1)(H). "Loss" under this provision is the greater of actual loss or intended loss. USSG § 2B1.1, comment. (n.3(A)). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss is the "pecuniary harm that the defendant purposely sought to inflict." *Id.*, comment. (n.3(A)(i)-(ii)). After concluding that the actual loss from Gaye's offense exceeded the amount of intended loss, the district court adopted the government's loss figure of $770,951.07, and increased Gaye's offense level accordingly.

Gaye contends that the facts do not support the court's calculation. He argues that he should have been held accountable for only the loss resulting from his own creation and negotiation of counterfeit checks. But a "sentencing court must include

-10-

in its calculation any losses caused by 'relevant conduct.'" *United States v. Quevedo*, 654 F.3d 819, 823 (8th Cir. 2011). In the case of a jointly undertaken criminal activity, relevant conduct includes "all acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity" and that "occurred during the commission of the offense of conviction." USSG § 1B1.3(a)(1)(B). When determining whether acts of co-conspirators qualify as relevant conduct under the guidelines, we look to "the scope of the *individual defendant's* undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole." *United States v. Spotted Elk*, 548 F.3d 641, 674 (8th Cir. 2008).

The district court did not clearly err in finding that the scope of Gaye's involvement in the conspiracy was substantial, and that the fraudulent transactions of his co-conspirators were foreseeable to him. The evidence tended to show that Gaye had extensive knowledge of how the scheme operated. Detective Joel Moore of the Edina Police Department testified that Gaye had been involved with the bank fraud scheme almost from its inception, and he described Gaye's involvement as both a runner and manufacturer for the scheme—depositing fraudulent checks into his own account and printing counterfeit checks for others. The detective also testified that Gaye coordinated and attended meetings with several of his co-conspirators where the group discussed dividing proceeds of the fraud and logistical issues presented by the scheme.

The government presented a chart that detailed dates of transactions, account holders, the check runner's name, and the amount of loss associated with each transaction that law enforcement believed was attributable to Gaye. According to Detective Moore, the chart "reflect[ed] all the transactions that law enforcement linked to this conspiracy." Special Agent Shannon Korpela of the IRS concurred, testifying that she and Detective Moore determined that the checks on the loss

-11-

schedules were connected to the conspiracy based on trash pulls, information from telephones seized during a search, a check-creating software program found on Gaye's computer, and information received from cooperating witnesses.

The court did not clearly err in finding that the transactions conducted by Gaye's co-conspirators were within the scope of the conspiracy and were reasonably foreseeable in light of Gaye's extensive involvement in the scheme. The court therefore properly treated the loss attributed to those co-conspirators as relevant conduct, and committed no clear error in concluding that the Gaye was responsible for the total loss listed on the government's chart.

5.

Gaye next complains that the district court clearly erred by applying a four-level increase under USSG § 3B1.1 for Gaye's role in the offense as an organizer or leader. "To qualify for an adjustment under [§ 3B1.1], the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG § 3B1.1, comment. (n.2). To distinguish an organizer or leader from a manager or supervisor, the court may consider: (1) the exercise of decisionmaking authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. USSG § 3B1.1, comment. (n.4).

The district court determined that Gaye was an organizer or leader based on its findings that "Gaye called meetings, monitored accounts, obtained victim information, was in many respects in the Court's view the initiator of the conspiracy and was involved from start to finish." The court also cited "the text messages in which Mr. Gaye was directing others as the crime was being committed." The record

-12-

supports these findings, and we see no clear error in the court's application of the four-level adjustment.

6.

Gaye next argues that the court clearly erred by applying a two-level specific offense characteristic under USSG § 2B1.1(b)(10)(C) for an offense involving "sophisticated means"—that is, "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1, comment. (n.9(B)). In finding that Gaye qualified for the increase, the district court highlighted the scheme's repetition and coordination, and found that Gaye opened a fraudulent business account to further the enterprise.

"Sophisticated means need not be highly sophisticated," and the adjustment is "proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense." *United States v. Norwood*, 774 F.3d 476, 480 (8th Cir. 2014) (per curiam) (brackets and internal quotation marks omitted). "[T]he sophistication of the offense conduct is associated with the means of repetition, the coordination required to carry out the repeated conduct, and the number of repetitions or length of time over which the scheme took place." *United States v. Laws*, 819 F.3d 388, 393 (8th Cir. 2016).

Gaye argues that his offense did not involve sophisticated means, because it amounted only to "stealing account numbers (often from social media)," "creating fake checks," taking those checks to a bank, and depositing them into co-conspirators' personal accounts. He argues that any other criminal could have committed this fraud, and that the offense was "crude and prosaic."

Gaye understates the sophistication of his work. He was embroiled in a scheme involving over 1500 fraudulent transactions and more than 500 participants that

-13-

persisted for eight years. For the conspiracy to succeed as long as it did, the scheme required "recruiting others so as to avoid detection," *Norwood*, 774 F.3d at 480, "coordination and planning," *United States v. Bistrup*, 449 F.3d 873, 883 (8th Cir. 2006), and a "vast network of coconspirators to carry out the scheme's numerous steps." *United States v. Jenkins-Watts*, 574 F.3d 950, 962 (8th Cir. 2009). The court did not clearly err in applying the increase.

7.

In his final challenge, Gaye contends that his sentence of 144 months is substantively unreasonable. We review the reasonableness of a sentence under a deferential abuse-of-discretion standard, *Gall v. United States*, 552 U.S. 38, 51 (2007), and we presume that a sentence within the advisory guideline range is reasonable. *See Hemsher*, 893 F.3d at 535.

Gaye's sole contention is that the district court failed to accord proper weight under 18 U.S.C. § 3553(a)(6) to the need to avoid sentencing disparities among similarly situated defendants. He notes that many of his co-conspirators were sentenced to terms of 3 to 136 months' imprisonment, and he argues that his 144-month sentence created an unwarranted sentencing disparity. But "[t]he statutory direction to avoid unwarranted disparities among defendants . . . refers to national disparities, not differences among co-conspirators, so [Gaye's] argument founders on a mistaken premise." *United States v. Pierre*, 870 F.3d 845, 850 (8th Cir. 2017). In any event, Gaye has not shown that he and any of these co-conspirators were similarly situated. The district court found "specifically that there is no unwarranted sentencing disparity," and that 144 months was "an appropriate placement given sentences given to codefendants in this case and in other similar cases." The court did not abuse its discretion, so we affirm Gaye's sentence.

-14-

B.

1.

Fillie raises seven claims of error. First, he challenges the district court's loss calculation. The district court concluded that Fillie was responsible for $770,551.08 in actual loss—a figure gleaned from another chart prepared by Detective Moore and Special Agent Korpela. Fillie disputes this figure.

Fillie contends that there was insufficient evidence to prove by a preponderance of the evidence that the loss caused by his co-conspirators was reasonably foreseeable to him. But the evidence tended to show that Fillie, like Gaye, had extensive knowledge of how the scheme operated and was deeply involved in its operations. Fillie participated in the scheme from 2007 to 2013, hosted the meetings where his co-conspirators discussed distributing profits, and served as both a runner and a manufacturer. On this record, it was not clearly erroneous to conclude that the transactions of Fillie's co-conspirators were reasonably foreseeable to him. The court properly held Fille responsible for the full amount of loss on the government's schedule.

2.

Fillie contends that the district court clearly erred in calculating the number of victims involved in his offense. The guidelines provide for a two-level increase if the offense "involved 10 or more victims." USSG § 2B1.1(b)(2)(A)(i). A "victim" is "any person," including a corporation, company, association, or firm, "who sustained any part of the actual loss." USSG § 2B1.1, comment. (n.1).

Fillie contends that he is responsible only for victims who suffered actual losses as a result of the transactions in which Fillie *personally* participated. On this

view, he counts seven (not ten) victims whose losses he caused. But under relevant conduct principles, a sentencing court must also include those victims who suffered pecuniary loss as a result of acts taken by others in the jointly undertaken criminal activity. USSG § 1B1.3(a)(1)(B). As we have concluded that Fillie reasonably could have foreseen the *loss* attributed to these victims, it follows that he reasonably could have foreseen that these *victims* would suffer the loss flowing from the conspiracy. The court properly applied the increase.

3.

Fille next argues that the district court clearly erred by applying a three-level increase under USSG § 3B1.1(b) for Fillie's role as a manager or supervisor of the scheme. Several factors are relevant to determining whether a three-level adjustment is warranted: the exercise of decisionmaking authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. USSG § 3B1.1, comment. (n.4).

The district court determined that a three-level increase was appropriate because "there [was] some level of organization on the part of Mr. Fillie," but the court did not "consider him to be at the level of Mr. Gaye in terms of being a leader." The record supports this finding. The evidence tended to show that Fillie's residence was a major hub of the fraudulent scheme and that he organized other participants. Detective Moore testified regarding surveillance conducted at Fillie's home, explaining that law enforcement observed Fillie's co-conspirators going to and from Fillie's home before and after the fraudulent transactions. Fillie also hosted meetings with his co-conspirators where they discussed logistics of the scheme and distributing profits. Fillie's role as a manufacturer gave him a central role in the offense, as without him the scheme could not persist. Considering the factors described in the

commentary to § 3B1.1, we conclude that there was no clear error in applying the adjustment.

4.

Fillie also challenges the two-level increase for sophisticated means under USSG § 2B1.1(b)(10)(C). He contends that his offense did not exceed the garden-variety bank fraud because he did only the "bare minimum necessary to commit the offense"—create false checks and help cash them—without engaging in activity that was either intricate or complex. This argument is substantially the same as the argument advanced by Gaye, and we reject it for the same reasons. *See supra* section II.A.6.

5.

Fillie next challenges the district court's calculation of his criminal history score. The district court determined that Fillie had nineteen criminal history points, which placed him in criminal history category VI. Fillie contends, however, that the court erred by assessing two criminal history points for each of the following convictions: (1) a 2011 conviction for check forgery, (2) a 2011 conviction for fifth-degree assault, (3) a 2013 conviction for second-degree refusal to submit to chemical testing, and (4) a 2014 conviction for driving under the influence. On this view, Fillie's total criminal history score would be 11, placing him in criminal history category V.

Fillie's conviction for check forgery involved an attempt to negotiate a counterfeit check on July 24, 2009, at TCF Bank. Fillie claims that the government included this counterfeit check on Fillie's loss schedule as part of his involvement in the instant offense. Because criminal history points are not assigned to sentences for "conduct that is part of the instant offense," USSG § 4A1.2, comment. (n.1); *see*

USSG § 4A1.1, Fillie argues that he should not have received any points for the check forgery conviction. Fillie's loss schedule, however, did not include the complained-of check, and the district court did not rely on the check in arriving at its loss findings. The district court therefore did not err in assigning criminal history points for this conviction.

Fillie argues in the alternative that he should have received only one criminal history point for the check forgery conviction, rather than two points, because he served only fifty days in jail. But "criminal history points are based on the sentence pronounced, not the length of time actually served." USSG § 4A1.2, comment. (n.2). Fillie was sentenced to 120 days, so the district court properly assigned the conviction two points. *See* USSG § 4A1.1(b).

Because the district court did not err in adding two criminal history points for the check forgery conviction, we need not address Fillie's challenges to the criminal history points assessed on the other three convictions: regardless of the number of points assigned to the other convictions, Fillie's criminal history category remains category VI.

6.

Fillie next contends that his sentence is substantively unreasonable, but he appears to base this argument largely on his view that the court should not have applied the challenged increases under the guidelines. Properly calculated, Fillie's guideline range for the conspiracy offense was 110 to 137 months, based on a total offense level of 25 and a criminal history category VI. The court sentenced Fillie to the bottom of the range—110 months—for that conspiracy count, and added a consecutive sentence of 24 months for aiding and abetting aggravated identity theft as required under 18 U.S.C. § 1028A(a)(1). In reaching this sentence, the district court specifically acknowledged Fillie's arguments in mitigation and considered the

-18-

seriousness of the offense and the length of Fillie's involvement in the scheme.  In light of the court's explanation, we see no abuse of discretion in the sentence imposed.

7.

Finally, Fillie appeals the district court's restitution order, arguing that the amount of restitution ordered ($770,551.08) should not have exceeded the amount agreed upon in Fillie's plea agreement ($481,929.17).  "We review the district court's decision to order restitution for abuse of discretion and its underlying fact determinations for clear error."  *United States v. Gregoire*, 638 F.3d 962, 973 (8th Cir. 2011).

Fillie agrees that the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, authorized the district court to order restitution.  Section 3663A provides that a sentencing court "shall order" a defendant convicted of "an offense against property under this title, . . . including any offense committed by fraud or deceit[,]" to pay restitution to a "victim of the offense."  18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  "[I]n the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a "victim" includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  *Id.* § 3663A(a)(2).  Fillie pleaded guilty to conspiracy to commit bank fraud, an offense that has as an element a conspiracy, so the court was authorized to order restitution to victims of that conspiracy.  *See United States v. Farrington*, 499 F.3d 854, 860-61 (8th Cir. 2007); *see also United States v. Rand*, 403 F.3d 489, 495-96 (7th Cir. 2005).

Fillie contends that the court should not have exceeded the amount of restitution agreed upon in Fillie's plea agreement, but this argument is unavailing for two reasons.  First, nothing in the text of the Mandatory Victims Restitution Act requires the court to limit its order of restitution to an amount agreed upon by the

-19-

parties, and the parties' plea agreement was not binding on the district court. Second, before sentencing, Fillie objected to the amount of restitution listed in his plea agreement, and the district court permitted Fillie to argue that he should be responsible for a lower amount. Fillie therefore repudiated the restitution stipulation before sentencing, and the court would have been free to disregard the figure in the plea agreement even if it were ordinarily binding. Having concluded that the actual loss suffered by the victims of the scheme was $770,551.08, the district court did not clearly err by ordering Fillie to pay restitution in the same amount.

C.

Sumoso's lone argument on appeal is that the district court erred in calculating the amount of loss attributed to him. Based on Sumoso's involvement in the conspiracy from 2007 to 2013, the court found that he was responsible for $770,651.08 in actual loss, and increased his offense level by fourteen levels. *See* USSG § 2B1.1(b)(1)(H).

Sumoso contends that he should not have been held responsible for losses that occurred during periods of time when Sumoso was not living in the Twin Cities. The government argues that the district court properly held Sumoso accountable for loss during this time, because Sumoso never affirmatively withdrew from the conspiracy. Under the sentencing guidelines, a conspiracy defendant is responsible for relevant conduct, including reasonably foreseeable acts of others, "unless and until he withdraws from the conspiracy in accordance with the common-law rule." *Spotted Elk*, 548 F.3d at 677. Whether Sumoso was properly held accountable for $770,651.08 in actual loss therefore turns on (1) his understanding of the scope of the conspiracy and whether his co-conspirators' acts were foreseeable to him, and (2) whether he withdrew from the conspiracy.

The evidence tended to show that Sumoso understood the full extent of the bank fraud scheme. As the district court explained, Sumoso "provid[ed] victim account information," "recruit[ed] runners, obtain[ed] counterfeit checks from the manufacturers, provid[ed] checks to runners, and transport[ed] runners." He also attended meetings to discuss logistics and profit-sharing with Gaye, Fillie, and other co-conspirators. There was sufficient evidence to support a finding that the activities of Sumoso's co-conspirators were reasonably foreseeable to him, given his understanding of the nature of the scheme. The losses associated with these activities are therefore attributable to Sumoso, unless he withdrew from the conspiracy during the periods when he was living outside the Twin Cities.

Under the common-law rule, a defendant withdraws from a conspiracy when he takes "affirmative action by making a clean breast to the authorities or by communicating his withdrawal in a manner reasonably calculated to reach his coconspirators." *United States v. Ortega*, 750 F.3d 1020, 1024 (8th Cir. 2014) (internal quotation marks omitted). "A showing of nothing more than that the defendant has ceased activities is not sufficient to establish a withdrawal from the conspiracy." *Id.* (internal quotation marks omitted). The defendant bears the burden of demonstrating withdrawal, *id.*, yet Sumoso presented no evidence that he took steps to end his involvement in the conspiracy when he was living in North Dakota or southern Minnesota. Nor did he claim that he notified authorities of his involvement in the conspiracy when he left the Twin Cities area.

The district court acknowledged that "the record demonstrates that Mr. Sumoso was sometimes in and out of the conspiracy," but ultimately concluded that "there is sufficient factual basis for the time that Mr. Sumoso was involved in this conspiracy," and that "for the length of time that the government has demonstrated, he did play a substantial role." This conclusion was not clearly erroneous. Another chart prepared by the investigators showed that Sumoso joined the conspiracy in August 2007 and that the conspiracy continued until September 2013. Without evidence of affirmative

-21-

withdrawal, it remained foreseeable to Sumoso that his co-conspirators would continue the bank fraud scheme without his assistance. The court therefore properly increased Sumoso's offense level by fourteen levels.

\*       \*       \*

For the foregoing reasons, the judgments of the district court are affirmed.

———————————————